## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 12-22539-CIV-ROSENBAUM

LATELE TELEVISION C.A., a Bolivarian
Republic of Venezuela corporation,

                Plaintiff,

v.

TELEMUNDO COMMUNICATIONS GROUP,
LLC, a Delaware limited liability corporation, and
TELEMUNDO TELEVISION STUDIOS, LLC, a
Delaware limited liability corporation, TELEMUNDO
STUDIOS MIAMI, LLC, a Delaware limited liability
corporation, TELEMUNDO NETWORK GROUP,
LLC, a Delaware limited liability corporation,
TELEMUNDO INTERNACIONAL, LLC, a
Delaware limited liability corporation,

                Defendants.

_____/

### ORDER ON DEFENDANTS' MOTION TO DISMISS

This matter is before the Court on Defendants Telemundo Communications Group, LLC;

Telemundo Television Studios, LLC; Telemundo Studios Miami, LLC; Telemundo Network Group,

LLC; and Telemundo Internacional, LLC's Motion to Dismiss, or Alternatively, for More Definite

Statement [D.E. 18].  The Court has carefully considered Defendants' Motion, all supporting and

opposing filings, and the entire record.  For the reasons set forth below, the Court now denies

Defendants' Motion.

### *I.  Background*

This copyright-infringement case centers around two Spanish-language telenovelas: Plaintiff

LaTele's *Maria Maria* and Defendants Telemundo Communications Group, LLC ("Telemundo");

Telemundo Television Studios, LLC ("Telemundo Studios"); Telemundo Studios Miami, LLC

("Telemundo Miami"); Telemundo Network Group ("Telemundo Network"), LLC; and Telemundo

Internacional, LLC's[1] ("Telemundo Internacional") *El Rostro de Analia* ("*El Rostro*").  Essentially,

Plaintiff asserts that *El Rostro*, which was written by one of the same authors as *Maria Maria*, is so

substantially similar to *Maria Maria* as to infringe Plaintiff's copyright in *Maria Maria*.

### A.  The Parties[2]

Plaintiff LaTele is a Venezuelan television network, organized and existing under the laws

of Venezuela.  D.E. 1 at ¶ 2.  Defendant Telemundo and all of the Telemundo Entities are Delaware

corporations with their principal places of business in Hialeah, Florida.  *Id.* at ¶¶ 3-7.  Defendant

Telemundo is the parent company of the Telemundo Entities, and it produces and distributes original

Spanish-language programming within the United States and worldwide on the Telemundo television

network ("Telemundo TV").  *Id.* at ¶ 3.  LaTele asserts that it "is informed and believes . . . that

Telemundo was involved in the approval and development of *El Rostro* and that some of the acts

described [in the Complaint] as having been committed by Telemundo Network . . . and Telemundo

Miami . . . may have also been committed by Telemundo and its agents."  *Id.*

As for the Telemundo Entities, according to the Complaint, Defendant Telemundo Network

---

[1]This Order refers collectively to Telemundo Television Studios, LLC; Telemundo Studios Miami, LLC; Telemundo Network Group, LLC; and Telemundo Internacional, LLC — all Defendants except Telemundo — as the "Telemundo Entities."  "Defendants" refers to all five Defendants, collectively.

[2]This Order takes its facts from the factual allegations contained in the Complaint in this matter, which, on a motion to dismiss, must be assumed to be true.  *See Meyer v. Greene*, ___ F.3d ___, ___, 2013 WL 656500, *9 n.2 (11th Cir. Feb. 25, 2013).

is the second-largest Spanish-language content producer in the world and owns and operates Telemundo TV, which is the second-largest Spanish-language television network in the United States. *Id.* at ¶ 4. Defendant Telemundo Miami creates, develops, and produces the Telemundo programming for Telemundo TV and for other broadcasters located in Latin America. *Id.* at ¶ 6. Telemundo Miami allegedly adapted and reproduced *El Rostro* in its studio in Hialeah and is credited as serving as the producer of *El Rostro*. Defendant Telemundo Studios is the managing member of Telemundo Miami. *Id.* Telemundo Network, in turn, is the managing member of Telemundo Studios. *Id.* at ¶ 5. LaTele asserts, on information and belief, that Telemundo Studios was involved in the development of *El Rostro*. *Id.* Finally, Defendant Telemundo Internacional is Telemundo's distribution company and is principally responsible for selling, licensing, and distributing Telemundo programming to foreign markets. *Id*. at ¶ 7. Like with Telemundo Studios, Telemundo Network is the managing member of Telemundo Internacional, which is operated by Telemundo. *Id.*

The Complaint asserts that all Defendants were "involved in the production, development, distribution, licensing, sale and public display of the telenovela, *El Rostro*, which infringes on LaTele's copyrighted works." *Id.* at ¶ 8.

### B.  Telenovelas

According to the Complaint, a telenovela is a limited-run serial dramatic television program that traces its roots to Latin American, Portuguese, and Spanish television. *Id.* at ¶ 16. The term "telenovela" takes its name from a combination of the words "tele," short for television, and "novela," a Spanish word for novel. *Id.* Although similar to soap operas, telenovelas are distinguishable from soap operas because telenovelas have a finite ending and conclude after a

defined run, usually within less than one year, with an average of approximately 120 episodes. *Id.* at ¶ 16. Thus, the duration of a telenovela is predetermined, with the overall story arc and conclusion known to the show's creators from inception. *Id.* Additionally, telenovelas are usually shown during prime time at night. *Id.* American soap operas, on the other hand, are open-ended and written to continue indefinitely, and they generally air during the day. *Id.*

*C.* Maria Maria

*Maria Maria* is an original telenovela that was created in 1989 and premiered on Marte TV in Venezuela from 1989 to 1990. *Id.* at ¶ 21. The show consisted of 198 episodes and was principally written by Humberto "Kiko" Olivieri Michelena ("Olivieri"). *Id.* at ¶ 22.

In *Maria Maria*, Julia is a kind, family-oriented woman, who had an affluent urban upbringing. *Id.* at ¶ 37. She has one child and an illegitimate brother who was abandoned by their rich father and was raised in poverty. *Id.* at ¶ 38. In addition, Julia has an unfaithful husband and learns that he is having an affair with Maria. *Id.* at ¶¶ 35, 36.a.

Determined to save her marriage, Julia confronts Maria during a drive. *Id.* at ¶ 36.b. Upset by the conversation and the circumstances, Julia loses control of her car, which goes off a cliff, crashes, and explodes. *Id.* at ¶ 36.c. Julia is found alive but badly burned and disfigured, next to Maria's identification documents and charred bones. *Id.* Because Julia is found near Maria's purse, which contains Maria's photo identification, doctors assume that Julia is Maria and reconstruct her face to look identical to that in the photograph of Maria on her identification. *Id.* at ¶ 23. Adding to Julia's woes, Julia suffers amnesia as a result of the car crash, so she is initially unaware that she is actually Julia. *Id.* As a result, Julia resumes her life as "Maria." *Id.* In so doing, Julia reencounters her real family and best friend, and they all inexplicably sense a strong connection. *Id.*

at ¶ 35.

Julia's best friend recognizes an identifying scar on her — one that was created between the friends during their childhood to make them "blood sisters."  *Id.* at ¶ 36.f.  After the friend recognizes other characteristics, she calls into question Julia's identity.  *Id.*  Finally, Julia and her bastard brother realize that she has assumed the incorrect identity of Maria.  *Id.*

Meanwhile, it is discovered that the real Maria also survived the crash but is being held captive. *Id.* at ¶ 35.  Eventually, Maria escapes from captivity, resulting in two different women with the same face and the same name.  *Id.*  Julia's family and her best friend learn that Julia now bears Maria's face and help her recover her memory.  *Id.*  Julia then reunites with her family and friends and marries her unfaithful husband, whom she previously resented.  *Id.* at ¶¶ 23, 35.

*Maria Maria* has been televised in, among other countries, Venezuela, the United States, Spain, Italy, Bolivia, Colombia, Costa Rica, the Dominican Republic, Ecuador, El Salvador, Guatemala, Honduras, Panama, Paraguay, and Peru. *Id.* at ¶ 25.  According to LaTele, the show was "immensely popular" during its initial run in Venezuela, and it remains popular to this day in Venezuela, where LaTele continues to broadcast it.  *Id.* at ¶ 24.

LaTele's predecessor entered into a series of written agreements with the writers of *Maria Maria*, in which the writers assigned the entirety of their respective intellectual property rights and interests in and to *Maria Maria* to LaTele's predecessor.  *Id.* at ¶ 27.  On November 9, 2010, LaTele registered *Maria Maria* with the United States Copyright Office.  *See* D.E. 1-1.  Previously, on December 30, 1991, *Maria Maria* was registered for copyright protection in Venezuela.  D.E. 1 at 8 n.5.

*D.* El Rostro

Defendants hired Olivieri to write a telenovela for them.  *See* D.E. 1 at ¶ 32.  Olivieri wrote *El Rostro*, which was the original working title of *Maria Maria*.  *Id.* at ¶¶ 32-35.  *El Rostro* consists of 178 episodes.  *Id.* at ¶ 34.

In *El Rostro*, Mariana is a kind, family-oriented woman, who had an affluent urban upbringing.  *Id.* at ¶ 37.  She has one child and an illegitimate brother who was abandoned by their rich father and was raised in poverty.  *Id.* at ¶ 38.  In addition, Mariana has an unfaithful husband and learns that he is having an affair.  *Id.* at ¶¶ 35, 36.a.

Determined to save her marriage, Mariana confronts the mistress's partner in crime, Analia, during a drive.  *Id.* at ¶ 36.b.  Upset by the conversation and the circumstances, Mariana loses control of her car, which goes off a cliff, crashes, and explodes.  *Id.* at ¶ 36.c.  Mariana is found alive but badly burned and disfigured, next to Analia's identification documents and charred bones.  *Id.*  Because she is found near Analia's purse, which contains Analia's photo identification, doctors assume that Mariana is Analia and reconstruct her face to look identical to that in the photograph of Analia on her identification.  *Id.*  Adding to Mariana's woes, Mariana suffers amnesia as a result of the car crash, so she is initially unaware that she is actually Mariana.  *Id.*  As a result, Mariana resumes her life as "Analia."  *Id.*  In so doing, Mariana reencounters her real family and best friend, and they all inexplicably sense a strong connection.  *Id.*

Mariana's best friend recognizes an identifying scar on her — one that was created between the friends during their childhood to make them "blood sisters."  *Id.* at ¶ 36.f.  After the friend recognizes other characteristics, she calls into question Mariana's identity.  *Id.*  Finally, Mariana and her bastard brother realize that she has assumed the incorrect identity of Analia.  *Id.*

Meanwhile, it is discovered that the real Analia also survived the crash but is being held captive. *Id*. at ¶ 34. Eventually, Analia escapes from captivity, resulting in two different women with the same face and the same name. *Id.* at ¶ 35. Mariana's family and her best friend learn that Mariana now bears Analia's face and help her recover her memory. *Id.* Mariana then reunites with her family and friends and falls back in love with her husband, whom she previously resented. *Id.* at ¶¶ 34, 35.

Telemundo Miami produced *El Rostro* at the behest, and with the permission of, Telemundo. *Id.* at ¶ 42. The show premiered on about October 20, 2008,[3] to more than one million viewers between the ages of 18 and 49 and was Telemundo and Telemundo Network's highest-rated launch since 2006. *Id.* at ¶¶ 43-44. *El Rostro*'s success continued, and the show proved to be immensely profitable for Telemundo. *Id.* at ¶ 45. At Telemundo's request, Telemundo Internacional has licensed and distributed the show to more than forty countries. *Id.* at ¶ 46.

*E. Comparison of* Maria Maria *and* El Rostro

According to LaTele, *Maria Maria* and *El Rostro* share the same author, core plot, exposition, conflict, climax, and closure. *Id.* at ¶ 35. They likewise contain the same sequence of events and characters and possess similar dialogue, pace, mood, and tone. *Id.* at ¶ 39. Although *El Rostro* contains some elements and antagonists not found in *Maria Maria*, LaTele describes these differences as "cosmetic," as opposed to qualitative, "aimed at masking that *El Rostro* is, in fact, simply *Maria Maria* updated and repackaged in a different setting (*Maria Maria* takes places in Caracas, Venezuela in the 1980's, while *El Rostro* purports to take place in Los Angeles, California

---

[3]The parties have executed five tolling agreements pertaining to the causes of action at issue in this case. Therefore, the statute of limitations does not appear to be an issue.

in the first decade of the twenty-first century)." *Id.* at ¶ 40.

LaTele asserts that viewers of both *Maria Maria* and *El Rostro* have observed the similarities between the programs. *Id.* at ¶ 50. In this respect, www.seriesnow.com describes *El Rostro* as a "[r]emake of the Venezuelan telenovela, 'Maria Maria,'" and http://Telemundo33.wordpress.com refers to *El Rostro* as a new version of *Maria Maria*. *Id.*

### F.  The Litigation

Based on these facts, LaTele sued all Defendants for copyright infringement (Count I). In addition, LaTele charged Defendants Telemundo and Telemundo Internacional with contributory copyright infringement (Count II). Finally, in Count III of the Complaint, LaTele asserted a claim for vicarious copyright infringement against Telemundo and Telemundo Internacional.

In response, Defendants filed their pending Motion to Dismiss, in which they essentially challenge the Complaint as insufficiently pled under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ascroft v. Iqbal*, 556 U.S. 662 (2009). Defendants' Motion to Dismiss is fully briefed and ripe for consideration.

### II. Analysis

### A.  Standard on a Motion to Dismiss

Defendants seek dismissal under Rule 12(b)(6), Fed. R. Civ. P. That rule provides, in relevant part,

> **(b)** How to Present Defenses. Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion:
>
> **(6)** failure to state a claim upon which relief can be granted; . . . .

*Id.* The Court, therefore, considers the Federal Rules of Civil Procedure as they set forth the requirements for stating a claim.

Rule 8(a)(2), Fed. R. Civ. P., demands that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While a complaint need not provide detailed factual allegations, the standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Wilchombe v. Teevee Toons, Inc.*, 555 F.3d 949, 958 (11th Cir. 2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Corbitt v. Home Depot U.S.A., Inc.*, 573 F.3d 1223, 1256 (11th Cir. 2009); *Cobb v. State of Florida*, 293 F. App'x 708, 709, *1 (11th Cir. 2008); *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007). Similarly, "naked assertion[s]" bereft of "further factual enhancement" do not suffice, either. *Twombly*, 550 U.S. at 555, 557. As the Supreme Court has explained, a complaint's "factual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555. "Moreover, the facts supporting the claim must be 'consistent with the allegations in the complaint.'" *Wilchombe*, 555 F.3d at 958 (quoting *Twombly*, 550 U.S. at 562). When reviewing a motion to dismiss, a court, as a general rule, must accept the plaintiff's allegations as true and evaluate all plausible inferences derived from those facts in favor of the plaintiff. *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012); *Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration Alliance*, 304 F.3d 1076, 1084 (11th Cir. 2002).

## B.  Count I

To state a claim for direct copyright infringement, a plaintiff must allege (1) ownership of a valid copyright and (2) copying of constituent elements of the work that are original. *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir. 1994). If a plaintiff lacks direct proof of

copying, the plaintiff may satisfy the second element by demonstrating "proof of access to the copyrighted work and probative similarity." *Peter Letterese and Assocs., Inc. v. World Institute of Scientology Enters.*, 533 F.3d 1287, 1301 (11th cir. 2008).

"Probative similarity" requires a showing of "substantial similarity" with respect to copyrightable material. *Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1224 (11th Cir. 2008) (citation omitted). "Substantial similarity," in turn, exists "where an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Id.* But, to satisfy probative similarity, it is not sufficient that a work simply bear substantial similarity to a copyrighted work; the substantial similarity must exist with respect to copyrightable aspects of the copyrighted work.[4] *Id.*

Protected elements of a copyrighted work do not include ideas. *Oravec*, 527 F.3d at 1224 (citing 17 U.S.C. § 102(b)) (other citations omitted). Rather, copyright law protects only the "particular expressions of ideas." *Id.* (citing 17 U.S.C. § 102(b)) (other citations omitted). This distinction, which is a lot easier stated than applied, is referred to as the idea/expression dichotomy. *Id.* As Judge Learned Hand observed, "Obviously, no principle can be stated as to when an imitator has gone beyond copying the 'idea,' and has borrowed its 'expression.' Decisions must therefore inevitably be *ad hoc*." *Id.* (quoting *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487,

---

[4]The parties also refer to an extrinsic and intrinsic test that a plaintiff must satisfy. *See* D.E. 18 at 7-8; D.E. 19 at 11-12. This nomenclature was used in *Herzog v. Castle Rock Entertainment*, 193 F.3d 1241 (11th Cir. 1999). Since the issuance of *Herzog*, however, the Eleventh Circuit has described the intrinsic/extrinsic formulation as "not useful" because "the two tests ultimately merge into a single inquiry: whether a reasonable jury could find the competing designs substantially similar at the level of protected expression." *Oravec*, 527 F.3d at 1224 n.5. For this reason, this Court does not analyze the Complaint under the intrinsic/extrinsic tests discussed in *Herzog*.

489 (2d Cir. 1960)) (internal quotation marks omitted).  In distinguishing between the two concepts of ideas and their expression, the idea/expression dichotomy "seeks to achieve a proper balance between competing social interests: that of encouraging the creation of original works on the one hand, and that of promoting the free flow of ideas and information on the other."  *Id.* (citation omitted).

Thus, *scenes a faire*, "the stock scenes and hackneyed character types that 'naturally flow from a common theme,'" are not protectible under copyright law because they are considered "ideas."  *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1266 (11th Cir. 2001) (citing *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459-60 (11th Cir. 1994)).  This is because it is "virtually impossible to write about a particular historical era or fictional theme without employing certain 'stock' or standard literary devices."  *Thompson v. Looney's Tavern Prods., Inc.*, 204 F. App'x 844, 850 (11th Cir. 2006) (quoting *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 979 (2d Cir. 1980)).

Keeping these considerations in mind, courts have evaluated plot, mood, characterization, pace, setting, and sequence of events in determining whether a work infringes on copyrightable material.  *Beal*, 20 F.3d at 460; *see also Herzog*, 193 F.3d at 1249 (quoting Z. Chaffee, *Reflections on the Law of Copyright*, 45 Colum. L. Rev. 503, 513 (1945) ("protection covers the 'pattern' of the work . . . the sequence of events and the development of the interplay of characters")), 1257.

Here, with respect to the first element of a copyright claim — ownership of a copyright, Defendants argue that LaTele has not sufficiently identified the specific original work that is the subject of its copyright-infringement claim.  *See* D.E. 18 at 9-11.  More specifically, Defendants complain that LaTele has not attached to its Complaint the original work in which it claims a

-11-

copyright. *Id.* Thus, Defendants claim, they cannot ascertain whether the allegedly infringed work consists of "all 198 episodes of *Maria Maria*, or possibly the teleplays for those episodes, or both." *Id.* at 9.

This Court is not similarly confused by the Complaint. To the contrary, the Complaint makes clear that LaTele claims a copyright in the entirety of all protectible elements embodied in the 198 episodes of *Maria Maria*. First, the Complaint explains that a telenovela is a finite story with an overarching story arc, which is told in chapters, much like a novel, suggesting that all of the chapters of a telenovela should be viewed together as a single work. Second, the Complaint sets forth the overarching story arc for *Maria Maria* and *El Rostro*, spanning the entirety of the work, not just an isolated incident in a discrete chapter here or there. Third, LaTele attached to its Complaint its United States Copyright Office Certificate of Registration for *Maria Maria*. *See* D.E. 1-1. That document identifies the covered work as "*Maria Maria.*" *See id.* It further specifies 198 as the number of items in the covered series. *Id.* In view of these allegations, the Court concludes that LaTele has sufficiently alleged ownership of a copyright in *Maria Maria* and has adequately identified the property that is the subject of this copyright action.

Nor, as Defendants indicate, is the Complaint deficient for not including as attachments copies of all 198 chapters of *Maria Maria* and the English translations of the scripts for all 198 *Maria Maria* episodes. The attachment of a copy of the work allegedly infringed or a copy of the allegedly infringing work is not required. *See* Nimmer on Copyright, § 12.09[B].

Also, the cases on which Defendants rely to assert that LaTele must attach a copy of its copyrighted work are materially distinguishable. In *DiMaggio v. International Sports Ltd.*, 49 U.S.P.Q.2d 1215 (S.D.N.Y. 1998), for example, the plaintiff claimed that his copyrights in certain

photographs that he had taken had been infringed.  But in describing the photographs in question, the plaintiff referred to "nebulous multiple images" with the same title, thereby making it impossible to discern the subject of his copyright-infringement claim.  *See id.*  Adding to the confusion, the certificate of copyright registration attached to the complaint indicated that it covered works with different titles than those that the plaintiff alleged that the defendant had infringed.  *See id.*

No similar dilemma exists in this case.  First, there is no indication of confusion between the 198 episodes of *Maria Maria* and some other, unspecified telenovela of the same name, written by the same authors, and consisting of the same number of chapters.  Second, the material specified in the Certificate of Registration in this matter plainly refers to the entirety of the 198 episodes of *Maria Maria*.

*Robbins v. Artits–Usher*, 2011 WL 5840257 (S.D. Ga. Aug. 29, 2011), is similarly uninstructive.  In *Robbins*, the plaintiff, a serial *pro se* filer who was required by the court to post a $100.00 "frivolity bond" with every lawsuit he filed, alleged, as he had on a number of other occasions, that a defendant had infringed his copyright in music that the plaintiff had allegedly written.  Because the allegations in the plaintiff's complaint were extremely deficient, the court dismissed the complaint.  *Id.* at *2.  In discussing the lack of sufficient allegations, the court noted that the plaintiff had also asserted that he had submitted "evidence of copying in a disk," even though no disk was submitted.  *Id.* at *2.  Although the court mentioned this fact, the court did not dismiss the case because the plaintiff had not filed the disk; instead, the court dismissed the complaint because it lacked the necessary factual allegations to establish a claim of copyright infringement.  Therefore, contrary to Defendants' suggestion, this case does not support the idea that a plaintiff must attach to its complaint a copy of the allegedly protected work.

-13-

Turning to the second element of a copyright-infringement claim — copying of constituent elements of the work that are original, Defendants do not contest that, through Olivieri, the author of both *Maria Maria* and *El Rostro*, they had access to *Maria Maria*.  Instead, Defendants direct their arguments towards the requirement that a plaintiff demonstrate probative similarity.

As for the first aspect of probative similarity — that an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work — the Court finds no deficiency in the Complaint.  Even setting aside the similarities brought out by the Complaint's descriptions of *Maria Maria* and *El Rostro*, the Complaint asserts that viewers of both telenovelas have observed the similarities of the works.  Indeed, as the Complaint points out, on www.seriesnow.com, a website that Defendants rely upon in their Reply brief, the Complaint states, *El Rostro* is described as a "[r]emake of the [V]enezuelan telenovela "*Maria Maria*."  For purposes of evaluating the Complaint on a motion to dismiss, these allegations suffice to establish "substantial similarity."[5]

With regard to whether the Complaint adequately alleges substantial similarity as to copyrightable material, Defendant argues that LaTele has done no more than rely on *scenes a faire* and ideas — not the expression of ideas, and thus, LaTele's claim of copyright infringement must be dismissed.  In support of this contention, Defendants cite a number of cases where courts have rejected copyright-infringement claims involving works of entertainment.  *See* D.E. 18 at 12-13.

The Court first notes that all of these cases were decided on summary judgment, not on a

---

[5]LaTele suggests that the inverse-ratio rule allows for a declining showing of substantial similarity with increasing proof of access.  The inverse-ratio rule, however, does not apply in this Circuit.  *Dream Custom Homes, Inc. v. Modern Day Constr., Inc.*, 476 F. App'x 190, 192 (11th Cir. 2012) (citing *Beal*, 20 F.3d at 460).

motion to dismiss.  This is significant because Defendants urge this Court to examine the entirety of both *Maria Maria* and *El Rostro* before passing on their Motion to Dismiss, apparently to find the differences between the two works, which are not brought out by the Complaint.  *See, e.g.*, D.E. 18 at 13.  But the Court must accept all non-conclusory facts set forth in the Complaint as true for purposes of evaluating a motion to dismiss, and the Court may not look beyond the four corners of the Complaint.  Therefore, unlike in the cases cited by Defendants, where the courts were required to consider differences between the copyrighted work and the allegedly infringing work brought out by the defendants, in this matter, on this motion, the Court accepts LaTele's well-pled facts at face value and does not delve further into the facts.

Second, each of the cases cited by Defendants is materially distinguishable from the case at hand.  For example, in *Benay v. Warner Brothers Entertainment, Inc.*, 607 F.3d 620 (9th Cir. 2010), the cited case where, arguably, the closest resemblance between the challenged work and the copyrighted work occurred, both stories involved an embittered American war veteran who traveled to Japan and met the emperor, trained the Imperial Army in modern warfare, fought against the Samurai, and was eventually spiritually restored.  *Id.*  In addition, both works were set at the time of the Satsuma Rebellion of 1877 and relied heavily on the same historical figure.

The court concluded that the plaintiff had failed to demonstrate substantial similarity in copyrightable material.  *See id.*  In reaching this conclusion, the court explained that both works shared certain plot similarities, but only "[a]t a very high level of generality."  *Id.* at 629.  Moreover, the court emphasized, "[a] number of similarities between the works arise out of the fact that both works are based on the same historical events, take place at the same time and in the same country, and share similar themes.  These similarities are largely between unprotected elements — historical

facts, characteristics that flow naturally from their shared premise, and scenes-a-faire." *Id.* As for important differences between the works, the court noted that the protagonist in each story was very different, with one protagonist beginning the work as an unmarried loner, a drunk, and a failure, with a meaningless job selling rifles, and the other as a happily married, successful West Point professor. *Id.* at 626-27. The court also observed that "a number of important characters" in each work had no "obvious parallel" in the other work.[6] *Id.* at 627.

As the Complaint is pled here, this matter is very different from *Benay* and all of the other cases on which Defendants rely. Significantly, the level of parallel between the details of *Maria Maria* and *El Rostro* is high. Unlike in *Benay*, where the similarities extended only to general themes of the works, in this case, the main characters are alleged to be virtually the same: both are kind, family-oriented women, who had affluent, urban upbringings. Likewise, both are married to cheating husbands, and both seek to address that problem. Both also have an illegitimate brother who was abandoned by their rich father and was raised in poverty, and a best friend she considers a "blood sister."

The plot for each work, as alleged in the Complaint, is also essentially identical. Both characters confront the infidelity issue during a car ride in which they lose control over the vehicle and experience a fiery crash. Both protagonists are found next to the photo identification of the passenger with whom they were traveling, and both passengers are presumed dead. Similarly, both lead characters' faces are reconstructed to appear like the faces of their passengers; both protagonists suffer from amnesia and begin to live the passengers' lives; and both characters feel an inexplicable

---

[6] Defendants also cite a number of other cases. Because none of the other cases cited by Defendants appear to involve works that share more in common than the works at issue in *Benay*, however, the Court does not specifically distinguish each such case.

bond to their past families.  In both stories, the protagonist's best friend recognizes an identifying scar on the protagonist that the two created as girls in a bid to become "blood sisters."  After the friend in both works recognizes other characteristics, she calls into question the protagonist's identity.  Then, the protagonist in each story and her bastard brother realize that the protagonist has assumed the incorrect identity of her passenger.

Meanwhile, it is discovered that the passengers in both stories also survived the crash but are being held captive.  Both passengers subsequently escape from captivity, resulting in the appearance of two different women with the same face and the same name in each work.  The protagonists' families and best friends then help the protagonists recover their memories.  *Id.*  Ultimately, both women fall in love with a man they previously resented.

While, as Defendants urge, it is true that this plot contains certain ideas that may be considered standard in telenovelas — a fiery car crash, plastic surgery, mistaken identity, amnesia, and infidelity — the level and number of similarities in the details, and particularly in the sequence of events, as set forth in both works, removes the similarities from the realm of ideas and propels them into the arena of expression of ideas.  Quite simply, nothing about the telenovela genre demands the unfolding of events as they are alleged to have occurred in both works or even that all of the shared incidents happen in a single work.

For example, the protagonist and the person whose identity she assumes could have been in an explosion elsewhere, under different circumstances.  Likewise, rather than being held captive, the passenger could have also been amnesiac before reappearing, or the passenger could have had an identical twin who came and took her place.  Or the protagonist's true identity could have been discovered differently — by dental or other medical work, or in some other manner.  Similarly, the

discovery of the protagonist's true identity could have been made by someone other than the protagonist's best friend.  And, even if the discovery were made by the best friend, she could have figured out the protagonist's true identity from a scar resulting from an earlier accident, a birthmark, or some peculiar mannerism of the protagonist.  Nor is there anything about the plot line that mandates the existence of a bastard brother abandoned by his father and raised in poverty.  The passenger also could have returned earlier in the story, causing an entirely different string of events to occur.  The possibilities are endless.

But in both *Maria Maria* and *El Rostro*, all of these events occur in a single work — and they all happen in precisely the same order.  These circumstances render the details that are similar copyrightable.  As a result, LaTele has pled sufficient facts in its Complaint to satisfy *Twombly*'s plausibility standard and establish a claim for copyright infringement.

## C.  Counts II and III

Count II alleges a claim for contributory copyright infringement against Defendants Telemundo and Telemundo Internacional.  Contributory copyright infringement is the intentional inducement, causation, or material contribution to the infringing conduct of another.  *BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 489 F.3d 1129, 1138 n.9 (11th Cir. 2007) (citation omitted).  Contributory copyright infringement occurs when "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 845 (11th Cir. 1990) (citation and internal quotation marks omitted).  In evaluating a claim for contributory copyright infringement, the court uses an objective standard of knowledge: "[k]now, or have reason to know."  *Id.* (citation and internal quotation marks omitted).

-18-

Count III asserts vicarious copyright infringement.  Vicarious copyright infringement happens when one profits from direct infringement of another while declining to exercise a right to stop or limit such behavior.  *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005).

Defendants argue that Counts II and III should be dismissed because their "key factual allegations . . . are made upon 'information and belief' or allege acts that 'may have been committed' or acts that were 'likely' committed."  D.E. 18 at 15.  The Court first notes that the mere fact that a complaint includes allegations asserted on information and belief is not, in and of itself, a basis for dismissal.  *See Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010).  Nevertheless, the Court need not consider whether, in this case, the information-and-belief allegations are sufficient because Counts II and III rest on allegations that are not alleged on information and belief.

In support of Count II, contributory copyright infringement, the Complaint claims that Telemundo and Telemundo Internacional had knowledge of Telemundo Network and Telemundo Miami's infringement of *Maria Maria* based on all Defendants' engagement or employment of Olivieri.  D.E. 1 at ¶¶ 22, 26, 32-33, 74.  As to the second element of contributory copyright infringement, the Complaint alleges that Telemundo intentionally induced or materially contributed to the infringement by controlling Telemundo Network and Telemundo Miami's creation and development of *El Rostro* and by approving its production and broadcast.  *Id.* at ¶ 78.  It further asserts that Telemundo Internacional distributed *El Rostro* worldwide.  *Id.* at ¶ 79.  None of the allegations cited above in support of LaTele's claims indicate that they are made on information and belief.  As noted previously, the Court must accept as true a plaintiff's factual allegations when evaluating a motion to dismiss.  Because LaTele has pled sufficient factual allegations to support a

claim for contributory copyright infringement, Defendants' Motion to Dismiss must be denied as it relates to Count II.

With respect to Count III, the Complaint states that Telemundo "had the right or ability to supervise Telemundo Network and Telemundo Miami's direct infringement" because it has the "final authority to green-light *El Rostro*" and approved the "decision to create, develop and produce *El Rostro*. D.E. 1 at ¶ 92. As for Telemundo Internacional, the Complaint charges that it "had the right or ability to supervise Telemundo Network and Telemundo Miami's direct infringement of *Maria Maria* because it marketed, distributed, disseminated, licensed, and sold *El Rostro* to numerous international affiliates." *Id*. at ¶ 93. Based on this control, the Complaint continues, Telemundo and Telemundo Internacional "could [have] stop[ped] or limit[ed]" the infringement but failed to do so. *Id*. at ¶ 94. In addition, the Complaint asserts that Telemundo and Telemundo Internacional each had "direct financial interests" in Telemundo Network and Telemundo Miami's production, distribution, and broadcast of *El Rostro* and thus profited from the direct infringement of *Maria Maria*. *Id*. at ¶ 95. Once again, none of these allegations rely on information and belief, and they are sufficient to state a cause of action for vicarious copyright infringement.

Nor does Defendants' reliance on the "bedrock principle of corporate law that a parent corporation is not liable for the acts of its subsidiaries, and cannot be held liable for infringement by its subsidiary unless there is a 'substantial and continuing connection' between the infringing acts of the parent and subsidiary," D.E. 18 at 16, change the outcome. First, pleading facts sufficient to pierce the corporate veil is not required in order to state a cause of action for vicarious copyright infringement. *See Broadcast Music, Inc. v. Evie's Tavern Ellention, Inc.*, 2011 WL 6012201, *2-3 (M.D. Fla. Nov. 30, 2011); *Joe Hand Promotions, Inc. v. Hart*, 2012 WL 1289731, *3 (S.D. Fla.

Apr. 16, 2012).  Second, in this case, LaTele has pled facts establishing more than a simple parent-subsidiary relationship.  More specifically, the Complaint claims that Telemundo oversees, approves, and controls all of the programming broadcast on Telemundo Network, including *El Rostro*, and reaped financial reward from *El Rostro*, and that Telemundo Internacional controlled and profited from its foreign distribution.  D.E. 1 at ¶¶ 74-79, 92-93.

Finally, the Court notes that, in their Reply, Defendants address none of LaTele's arguments with regard to why Counts II and III survive Defendants' Motion to Dismiss.  The Court construes this complete lack of a response to LaTele's position on Counts II and III as an implicit concession that Counts II and III are sufficient to survive Defendants' Motion to Dismiss.

### *III. Conclusion*

For the foregoing reasons, Defendants Telemundo Communications Group, LLC; Telemundo Television Studios, LLC; Telemundo Studios Miami, LLC; Telemundo Network Group, LLC; and Telemundo Internacional, LLC's Motion to Dismiss, or Alternatively, for More Definite Statement [D.E. 18] is **DENIED**.

**DONE and ORDERED** at Fort Lauderdale, Florida, this 26th day of March 2013.

ROBIN S. ROSENBAUM
UNITED STATES DISTRICT JUDGE

copies:        Counsel of Record