**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 12-22539-CIV- GOODMAN**

**[Consent Case]**

LATELE TELEVISION, C.A.,

      Plaintiff,

v.

TELEMUNDO COMMUNICATIONS
 GROUP, LLC, et al.,

      Defendants.

_____/

**ORDER ON WHETHER DEFENDANTS ARE ENTITLED TO PRIVILEGED**
**DOCUMENTS FROM ROBERT ALLEN LAW, P.A.**

This Cause is before the Court on: Defendants' Notice of Hearing regarding

Robert Allen Law, P.A.'s ("RAL") response to subpoena *duces tecum* [ECF No. 226]; a

May 30, 2014 hearing before the Court [ECF No. 233]; supplemental briefs filed by all

parties [ECF Nos. 242; 249]; an evidentiary hearing held August 20-21, 2014 [ECF Nos.

311; 313] (the "Hearing"); additional affidavits filed by Plaintiff [ECF No. 331] in

response to the Undersigned's Post-Hearing Order [ECF No. 314]; Plaintiff's Third

Amended Privilege Log [ECF No. 349]; an *in camera* review of the under-seal privileged

documents (most of which are in Spanish) [ECF No. 349-1]; and RAL's "response"[1] to Defendants' proposed order [ECF No. 351].

Defendants contend that they are entitled to privileged documents responsive to a subpoena they issued to RAL (the "RAL Subpoena") under several theories, any one of which they say is sufficient to justify their requested relief: (1) the crime-fraud exception arising from Plaintiff's alleged discovery misconduct in failing to produce responsive documents (or failing to give accurate interrogatory answers and deposition testimony) and then lying about the non-existence of the documents, which Defendants contend are critical and could destroy Plaintiff's entire case, (2) the crime-fraud exception arising from Plaintiff's alleged fabrication of a document (the "Addendum") designed to explain away the documents Defendants allegedly tried to hide (but which were ultimately produced by a third party), (3) the waiver theory, arising from Defendants' purposeful and voluntary disclosure of privileged documents, and (4) the waiver theory, arising from Defendants' decision to put certain matters at issue in a prejudicial matter.

---

[1]   RAL is not a party to this litigation but noted that it felt compelled to submit a response "to shed light upon the shadow Defendant's counsel have cast upon it and the evidence." [ECF No. 351, p. 1].

In their proposed order [ECF No. 359-1],[2] Defendants also ask that the case be dismissed for either of the two crime-fraud arguments. This request, however, is not at issue here.  The only issue addressed in this Order is whether the privileged documents from RAL's files must be produced under any of the four theories outlined above.  The dismissal argument will be assessed in connection with Defendants' separately-filed motion to dismiss for lack of subject matter jurisdiction or for failure to comply with court orders. [ECF No. 166]. The motion to dismiss is based on the same theories -- that Plaintiff repeatedly failed to produce relevant documents and give accurate testimony (in interrogatory answers and a deposition) and then lied about it and also later fabricated a fraudulent document in order to address the jurisdictional challenge raised in the underlying motion to dismiss.

For the reasons outlined below, the Court **agrees, in part,** with Defendant's waiver-by-voluntary disclosure theory, and orders a few (but not all) of the privileged documents to be produced. The Court is ordering only privileged documents to be produced that concern the same subject matter as the documents where Plaintiff waived the privilege. As explained in detail below, only a few documents on the privilege log concern the same subject matter.

---

[2]     The Undersigned required the parties to submit proposed orders on the subject of whether privileged documents responsive to the RAL Subpoena should be produced. [ECF No. 314, p. 2]. Defendants submitted an amended proposed order [ECF No. 359-1] correcting certain issues with their first proposed order [ECF No. 338].

The Court does not agree that the failure to produce documents and the alleged misstatements about discovery generate a crime-fraud waiver here because the documents at issue (i.e., those containing confidential communications) were created *before* the alleged misconduct, and Defendants have not demonstrated that Plaintiff was engaged in criminal or fraudulent conduct when it sought advice from RAL or that it committed a crime or fraud after receiving advice from RAL. Similarly, Defendants have not established that the RAL attorney's assistance was obtained in furtherance of the criminal or fraudulent activity.

Although Defendants contend that RAL helped Plaintiff conceal documents by not advising trial counsel (at another firm) about the documents or the transactions at issue in the never-produced-by-Plaintiff documents, the privileged documents, for the most part, do not concern discovery. This alleged discovery misconduct may, however, generate consequences related to other issues -- i.e., those at issue in the motion to dismiss.

The Court is not prepared to now conclusively find that Plaintiff fabricated a critical document -- the so-called Addendum. To be sure, there is evidence to suggest that the Addendum was fraudulently manufactured after the fact. But there is also evidence to suggest that it was not. In order to accept Defendants' argument and to conclude that the crime-fraud exception applies, the Undersigned would, in effect, need to make a credibility choice between witnesses. Moreover, although Defendants have made a *prima facie* showing of criminal or fraudulent conduct concerning the

Addendum, Plaintiff has provided an explanation, which, if believed, would explain its conduct and put to rest the significant concerns flowing from circumstances which could be deemed highly suspicious.

But even if Plaintiff manufactured the Addendum, that would not satisfy all the elements of the crime-fraud exception to the attorney-client privilege and work product exception to discovery because the fraudulent fabrication (if it happened) would have occurred long after the privileged communications were exchanged. Therefore, Defendants cannot establish the necessary connection between the misconduct and the privileged communications. But, similar to the alleged discovery misconduct, the fabrication-of-evidence issue may lead to other serious consequences -- i.e., those asserted in Defendants' motion to dismiss.

By way of a final introductory point, the Undersigned is not convinced that Plaintiff has unfairly injected an issue into this case to the extent necessary to create a waiver of the attorney-client privilege.

## I.    Factual Background

Six witnesses testified at the two-day Hearing. [ECF Nos. 324; 325]. James Sammataro, of Stroock & Stroock & Lavan ("SSL"), Plaintiff's initial counsel of record, testified that RAL was the "conduit" for nearly all documents and information he received from Plaintiff, especially those related to Plaintiff's discovery responses. RAL was Plaintiff's outside general counsel and provided significant assistance to SSL in the

litigation. In particular, Peggy Garcia, an RAL attorney, coordinated the production of documents and information given to Mr. Sammataro.

Neither Plaintiff, nor RAL, ever disclosed critical copyright transfers, negotiations leading up to the execution of transfer documents, or related documents to SSL despite repeated, direct inquiries during SSL's investigation of the Complaint and preparation of responses to discovery. As described below, Mr. Sammataro did not see several key documents until they were included as exhibits to Defendants' motion to dismiss, filed on March 31, 2014. [ECF No. 166]. He also had no knowledge of those transactions before Defendants filed their dismissal motion (long after he was no longer involved in this case).[3]

Ms. Garcia graduated from law school in December 2008. She began working at RAL in January of 2010. She has never done any litigation work. RAL has three full-time litigation attorneys and one attorney who does both litigation and real estate law, but she never consulted with any of them about the discovery-related assistance she provided to Plaintiff and the SSL firm in this case. Before this lawsuit, Ms. Garcia never

---

[3]    Mr. Sammataro filed the lawsuit on behalf of Plaintiff on July 10, 2012. He filed his motion to withdraw [ECF No. 37] on September 5, 2013. He filed a charging lien notice [ECF No. 38] the same day. The Court granted the withdrawal motion [ECF No. 47] on October 9, 2013. Plaintiff's new trial counsel, Albert Piantini, filed a notice of appearance [ECF No. 50] on November 8, 2013. Co-counsel Andrew Kassier filed a notice of appearance [ECF No. 55] on November 16, 2013. Defendants filed their dismissal motion (based on new documents produced by a third party) [ECF No. 166] on March 31, 2014.

helped clients in reviewing proposed interrogatory answers, reviewing proposed responses to document requests, or reviewing other responses to discovery.

Notwithstanding this lack of litigation experience, Ms. Garcia testified that she reviewed discovery responses with Fernando Fraiz, Plaintiff's principal, and was aware of documents executed in April 2012 transferring *Maria Maria* first to Mr. Fraiz (the "First Assignment"), and then to Latele Productions, Inc. ("Latele US") (the "Second Assignment"). Ms. Garcia drafted and notarized some of the documents; yet she did not reveal this information to SSL or ensure it was included in interrogatory answers, some of which she also notarized. She admitted, in retrospect, that the information and documents *should have been disclosed*. Her only knowledge of the so-called "Addendum," which Plaintiff now claims reversed the First Assignment (which Mr. Fraiz described as an "involuntary error") came from oral conversations with Mr. Fraiz. She advised Mr. Fraiz that "a transfer of *Maria Maria* would negatively affect this case." [ECF No. 324, pp. 118-19].

Ms. Garcia testified that she did not disclose the existence of these transactions (whether they were undone, rescinded, aborted, canceled, superseded, corrected or otherwise deemed no longer valid) to SSL or to Defendants because her understanding was that the underlying transaction never went through. She did not do any independent legal research on her own to see if the information about the transactions should have been disclosed in interrogatory answers or whether documents concerning the transactions should have been produced in response to document requests. She did

not consult with any of the RAL litigation attorneys to see if they would have disclosed the information. And she did not see the Addendum which supposedly (if not manufactured after the fact) reversed the First Assignment.

Although Ms. Garcia notarized one of the transaction documents, she did not keep a copy. She returned the original to Mr. Fraiz but did not ask him for a copy when she was marshaling documents for the SSL firm. [ECF No. 324, p. 88].

Ivan Morales, General Counsel for Plaintiff's distributor Somos Distribution, LLC ("Somos"), testified to lengthy negotiations between Plaintiff and nonparty Televisa. He testified about the drafting and execution of multiple documents transferring rights to *Maria Maria*, including the First and Second Assignments, and numerous communications and documents exchanged between Plaintiff, Somos, and Televisa, both before and after the Complaint was filed. Plaintiff never advised Mr. Morales of any purported "reversal" of the First Assignment or the alleged existence of the Addendum. Mr. Morales testified that *Maria Maria* was included in the negotiations with Televisa from at least June 2011, a year before the lawsuit was filed, and he was not told otherwise until sometime in the summer of 2013, the year after the Complaint was filed. [ECF No. 324, pp. 133; 167].[4]

---

[4]   Mr. Morales testified that the negotiations with Televisa were for a 15-year license, not an outright purchase. But this does not mean that the negotiations and signed agreements were not required to be produced in discovery if responsive and non-privileged. Plaintiff has not asserted privilege to the Transfer Documents or the Addendum. Mr. Morales admitted that documents reflecting transfers of the negotiations over *Maria Maria* were responsive to Defendants' discovery requests.

Fernando Fraiz admitted executing the First and Second Assignments but testified that the transfers, negotiations, and related documents were never disclosed by Plaintiff in discovery because the deal with Televisa was never consummated; and regardless, he claimed, *Maria Maria* was never an intended part of the Televisa deal. He testified that including *Maria Maria* in the transfers was a "mistake" he sought to correct with the Addendum.

Carlos Dominguez, a Venezuelan attorney with extensive experience notarizing documents in Venezuela, testified that multiple indicia on the face of the Addendum indicate that it was received by a particular Venezuelan notary office on April 18, 2012, executed before officials of that office on April 20, 2014, and filed on a unique page within the records of that office. Nevertheless, Mr. Dominguez testified that he inspected the records of that notary office and found an entirely different document filed on that page.

Alexander Preziosi, a Venezuelan attorney familiar with the Venezuelan notary system, did not dispute Mr. Dominguez's testimony. He could think of only two possible explanations for the absence of the Addendum in the notary records where it purported to be filed: fraud or a filing error. In his 24 years of experience, he testified he knew of only two examples of documents being misfiled in this manner.

### II.    Legal Framework and Application of the Crime-Fraud Exception

"The attorney-client privilege does not protect communications made in furtherance of a crime or fraud." *U.S. v. Cleckler*, 265 F. App'x 850, 853 (11th Cir. 2008) (internal quotation marks omitted). This Circuit applies a two-pronged test for the crime-fraud exception:

> First, there must be a *prima facie* showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of counsel, that he was planning such conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the benefit of counsel's advice. Second, there must be a showing that the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it.

*Id.* at 853 (quoting *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1416 (11th Cir. 1994)).

Discovery fraud including violating orders to compel, failing to provide information responsive to interrogatories, falsely and repeatedly testifying that the opposing party "had received all" responsive documents, and false and misleading statements to the Court can under certain circumstances be "sufficient to show a *prima facie* case" for application of the crime-fraud exception, *Gutter v. E.I. DuPont De Nemours*, 124 F. Supp. 2d 1291, 1298 (S.D. Fla. 2000), as is fabricating material evidence, *Cleckler*, 265 F. App'x at 853-854. The attorney need not be aware he is assisting in a fraud for the exception to apply. *In re Grand Jury Investigation*, 842 F.2d 1223, 1227 (11th Cir. 1987); *Gutter*, 124 F. Supp. 2d at 1300-1301. "[T]he party opposing the privilege on the crime/fraud exception has the initial burden of producing evidence which, **if unexplained**, would be *prima facie* proof of the existence of the exception. The burden of

persuasion *then shifts to the party asserting the privilege* to give a **reasonable explanation** of its conduct." *Gutter*, 124 F. Supp. 2d at 1307 (emphasis added).

### A.  Plaintiff's Discovery Conduct

Less than four months before Plaintiff filed this action, Mr. Fraiz, Plaintiff's principal and highest authority [ECF No. 324, pp. 26, 252-53], entered into three transactions involving *Maria Maria,* including: (1) the First Assignment -- a document dated April 18, 2012 that on its face transferred all rights in *Maria Maria* from Plaintiff to Mr. Fraiz personally; (2) the Second Assignment -- a second document dated April 18, 2012 that on its face transferred all rights in *Maria Maria* from Mr. Fraiz personally to Latele U.S., a company owned by Mr. Fraiz; and (3) a third document dated April 18, 2012 that authorized Mr. Fraiz to enter into the Second Assignment on behalf of Latele U.S. (the "Joint Consent"). [ECF No. 324, pp. 81-88]. The First Assignment, Second Assignment, and Joint Consent are collectively referred to as the "Transfer Documents."[5]

Ms. Garcia admitted she was aware of these transactions; in fact, she drafted the Second Assignment and Joint Consent. [ECF No. 324, pp. 27, 58, 272-73]. RAL was Plaintiff's outside general counsel and coordinated its responses to discovery requests

---

[5]     The First Assignment, Second Assignment, and Joint Consent were exhibits 12, 13, and 14 at the Hearing, respectively. A full list of exhibits admitted at the Hearing is available at ECF No. 323. The First Assignment is also found at ECF No. 24, pp. 11-17. The Second Assignment is also found at ECF No. 166-1, pp. 53-59. The Joint Consent is also found at ECF No. 166-1, p. 52.

in this case with outside litigation counsel (i.e., SSL). [*Id.*]. Ms. Garcia reviewed with Mr. Fraiz the draft answers to some of Defendants' interrogatories. For example, Ms. Garcia reviewed Plaintiff's Answers and Objections to Defendant Telemundo Studios Miami, LLC's First Set of Interrogatories with Mr. Fraiz and notarized his signature on that document. [ECF No. 324, pp. 91-96]. The first interrogatory sought detailed information about *Maria Maria's* chain of title.[6]

In its interrogatory answer, Plaintiff failed to identify -- or make any reference to -- the Transfer Documents and failed to identify Mr. Fraiz or Latele U.S. as "entities or individuals who have ever owned [*Maria Maria*]," though at the Hearing, Ms. Garcia admitted that "[i]n hindsight I should have." [Ex. 1, pp. 4-5; ECF No. 325, pp. 61-64].[7] Similarly, Plaintiff failed to produce these documents in response to Defendants' document requests. Request 19 of Defendants' Second Request for Production (served November 16, 2012) sought: "All documents reflecting or evidencing any transfers, licenses, sublicenses, encumbrances, pledges, or any other transactions of any kind

---

[6]    Exhibit 1 at the Hearing was Plaintiff's Answers and Objections to Defendants' First Set of Interrogatories (also found at ECF No. 166-3, pp. 68-79). The first interrogatory sought information related to "all prior owners of [*Maria Maria*], all transfers or assignments of ownership or other translations affecting ownership or any rights in and to [*Maria Maria*], and . . . any other entities or individuals who have ever owned [*Maria Maria*]."

[7]    References to exhibits are to those exhibits admitted at the Hearing. A full list of admitted Hearing exhibits is available at ECF No. 323.

involving any of the copyrights or other intellectual property rights of any kind, or any other rights related to the work(s) allegedly infringed." [Ex. 42, p. 16].

In response to the document request, Plaintiff "agree[d] to produce all responsive non-privileged documents specifically pertaining to *Maria Maria* . . . . " [Ex. 42, pp. 16-17]. Nevertheless, Plaintiff never produced or otherwise disclosed the Transfer Documents in response to this or any other discovery requests. [ECF No. 324, pp. 54, 83-89].

> Defendants' Fourth Request for Production  sought, at Request 11:
>
> Communications between Plaintiff (specifically including any of its officers and affiliated entities) and LaTele Productions, Inc. [*i.e.* Latele U.S.] (or any predecessor, successor, or related entities), regarding any transaction, offer, arrangement, or proposal relating to telenovelas, including, without limitation, the . . . assignment . . . of any telenovela, including, without limitation, *Maria Maria* . . .

[Ex. 43, p. 6]. In response, Plaintiff stated: "There are NO responsive documents in LATELE'S possession, custody or control." [Ex. 44, p. 2] (emphasis in original). Defendants' other document requests and interrogatories sought information about negotiations and other documents.[8] In each of these document requests, Defendants sought "all electronically stored information" in addition to other formats, and thus the

---

[8]     *See, e.g.,* Ex. 4, pp. 2-4 (Plaintiff's Amended Answers to Defendants' First Set of Interrogatories), Interrogatories 1-3 (seeking information about "negotiations regarding the prospective sale and/or licensing of *Maria Maria*"), Interrogatories 4-6 (seeking information about "offer[s] . . . or proposals concerning telenovelas"); ECF No. 125-7, p. 4, Requests 1-2 (seeking documents and communications reflecting "negotiations regarding the prospective sale and/or licensing of *Maria Maria*").

requests included metadata.[9]

Mr. Fraiz testified at the Hearing that the First Assignment was "corrected" and "reversed" and the Second Assignment and Joint Consent were, for all practical purposes, ineffective. [ECF No. 324, pp. 269-270, 272]. Defendants contend that Mr. Fraiz's testimony on this point is not credible. They also make another argument: even if the transactions **were** undone or reversed or otherwise ineffective, they were unquestionably **responsive** to multiple discovery requests propounded by Defendants. Each attorney who testified (including Ms. Garcia herself) indicated that these documents *were* responsive to requests for documents reflecting any transactions involving *Maria Maria*.[10] [ECF Nos. 324, pp. 54, 224-25; 325, pp. 61-63]. But Plaintiff repeatedly swore that no such documents or transactions existed in its possession, custody, or control.[11]

---

[9]     *See, e.g.,* Ex. 43, p. 2 (defining "[d]ocuments" to include "all electronically stored information"). The parties agreed to a protocol for production of electronically stored information. [ECF No. 112, p. 17].

[10]     Ms. Garcia testified that she never advised Mr. Fraiz not to disclose the transactions reflected in the First Assignment, the Second Assignment or the Joint Written Consent. [ECF No. 324, pp. 94-95]. She also testified that Mr. Fraiz never asked her to not disclose the transactions. [*Id.*].

[11]     *See, e.g.,* Ex. 5, ¶¶ 8, 10 (also found at ECF No. 127-1, p. 14); Ex. 7, ¶ 3e (also found at ECF No. 144-1, pp. 1-3).

The Court finds that these statements -- made while Plaintiff silently withheld responsive documents and provided incorrect interrogatory answers -- were **false**.[12] Moreover, it is clear that Plaintiff had a strategic motivation to hide the existence of the transactions and the documents which evidenced them.[13] But that does not mean that privileged communications created earlier must now be produced. The presence of false statements in discovery, combined with a failure to produce responsive discovery, is problematic, to be sure, but it does not automatically lead to the conclusion that all privileges are lost.

As referenced above, there are two necessary elements for the crime-fraud exception to apply: (1) a prima facie showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of counsel, that he was planning such

---

[12]    In a deposition, Mr. Fraiz testified that he never contemplated personally owning any rights to *Maria Maria* and that such a transaction was never executed. [ECF No. 166-1, p. 210, lines 9–17].

[13]    As outlined in Defendants' motion to dismiss [ECF No. 166], a plaintiff seeking to bring a claim for copyright infringement must exclusively own the work it claims was infringed at the time the lawsuit is filed. Without such ownership, a plaintiff lacks standing to bring the claim. *See e.g., Saregama India Ltd. v. Mosley,* 635 F.3d 1284, 1986 (11th Cir. 2011) (finding lack of subject matter jurisdiction because Plaintiff did not currently own a copyright in the work at issue). If the Transfer Documents were not undone by the so-called Addendum, then, Defendants argue, Plaintiff has no standing to pursue the case and the Court must dismiss it. It was only after Defendants filed their motion to dismiss that Plaintiff produced the Addendum.

The Undersigned is not now making any findings about the legal significance of the Transfer Documents or the Addendum -- other than to conclude that they were **responsive to discovery requests**. Likewise, the Court is not reaching any conclusions here about Plaintiff's standing (or lack of standing) to pursue this lawsuit.

conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the benefit of counsel's advice; and (2) a showing that the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it. *Cox*, 17 F.3d at 1416 (internal citation omitted).

The communications at issue here are dated from August 12, 2011 through September 26, 2013. According to the third amended privilege log, there are no documents concerning discovery in this lawsuit -- the subject of the false answers creating the first crime-fraud theory. Instead, they are about other issues, some relating to this lawsuit, but none regarding the discovery misconduct. A significant portion of the withheld documents concern funding for the lawsuit. It is difficult to imagine how Defendants can demonstrate that Plaintiff or its principal, Mr. Fraiz, was involved in criminal or fraudulent conduct when discussing with counsel ideas about how to fund the lawsuit. The attorney's advice about funding would not have been in furtherance of the criminal or fraudulent activity (i.e., in furtherance of the discovery stonewalling and false discovery answers).

As noted above, however, the false discovery responses may trigger *other* consequences. The Undersigned's ruling that they have not created a waiver of privilege for the RAL privileged documents under the crime-fraud exception hardly means that the Court is ignoring the false and misleading discovery responses. The

consequences will be discussed in a later ruling on the separately filed motion to dismiss.[14]

### B.  The Alleged Fabrication of the Addendum

The parties vigorously disagree about the bona fides of the so-called Addendum. Plaintiff contends it is legitimate while Defendants brand it as a fraudulent sham.

While it is uncontroverted that the Addendum first appeared in this case on April 17, 2014, as part of Plaintiff's Response to Defendant's Motion to Dismiss, which asserted that the Transfer Documents deprived Plaintiff of standing, Plaintiff claims the Addendum was created and executed in April 2012. [ECF Nos. 185, p. 6; 185-4]. In support of their contention that the Addendum was fabricated in response to the Motion to Dismiss, Defendants produced documentary evidence and expert testimony that the face of the Addendum indicates it was filed, and should appear, at a unique page of the records of a particular notary office. [ECF No. 325, pp. 75-85]. Nevertheless, when Defendants' expert inspected those records, a completely different document appeared. [ECF No. 325, pp. 85-90]. Neither party has located any notary records where the Addendum was actually recorded. [ECF No. 325, p. 170]. Thus, Defendants assert the Addendum was not actually filed with that notary office and instead was created after-the-fact.

---

[14]   The fact that *Somos*, a third party who Plaintiff describes as its agent, ultimately produced the Transfer Documents in discovery does not excuse **Plaintiff's** failure to produce them or otherwise disclose the existence of the transactions. Likewise, the fact that Plaintiff and RAL contend that the transactions are now null and void (or did not "go through") is also not an adequate ground to withhold the requested discovery.

However, as referenced above, the Addendum itself and Mr. Fraiz's testimony support Plaintiff's position that it was created in 2012.

Defendants note that no other documents were offered to corroborate Plaintiff's contentions about the timing. They also contend that no other witnesses were able to testify that they had ever seen or had specific knowledge of the Addendum at that time, but the Court finds this position to be unconvincing.

For example, Plaintiff submitted the declaration (made under penalty of perjury) of Paola Alexandra Munive Castillo, a Venezuelan attorney. [ECF No. 331-2]. In this affidavit, Ms. Munive explained that she prepared, drafted, and reviewed the Addendum in 2012, at the request of Xiomara Ruiz, an agent of Mr. Fraiz's. [*Id*.]. Ms. Ruiz also submitted a declaration. [ECF No. 331-1].

Thus, in order to accept Defendants' theory that the Addendum was created in 2014, not 2012, the Undersigned would need to conclude that both Ms. Munive, a Venezuelan attorney, and Ms. Ruiz committed perjury in their declarations. To be sure, Defendants want the Court to make that finding and they offer several arguments why the Undersigned should brand the testimony of Mr. Fraiz and the declarants as perjury.

First, Defendants challenge Plaintiff's expert who responded to testimony that the Addendum was not found in the records of the identified notary office. Plaintiff's expert offered only two possible explanations: (1) the Addendum was a fraud; and (2) the Addendum was misfiled. [ECF No. 325, pp. 143, 150-51]. Plaintiff's expert indicated fraud was a common occurrence in notarized documents in Venezuela. [ECF No. 325, p.

18

155]. In contrast, he testified that, in his 24 years' experience, he had knowledge of documents being "misfiled" in this manner on only two occasions. [ECF No. 325, p. 143]. Therefore, Defendants argue, neither Plaintiff nor its expert contradicted Defendants' expert's testimony that the Addendum does not appear in the records of the indicated notary office, or that the notary's certification indicates on its face that the Addendum was created and submitted for notarization on April 18, 2012.

Defendants also stress that Plaintiff presented no metadata or other documentary evidence to confirm that the Addendum was actually created in April 2012. Plaintiff presented declarations by Xiomara Ruiz, Newman Viloria, Paola Munive Castillo, and Fernando Fraiz, which indicate that no documents or electronically stored information ("ESI") were found relevant to the creation or execution of the Addendum.[15] [ECF Nos. 331-1; 331-2; 331-4]. Defendants suggest that this is not a coincidence. To the contrary, they argue that the complete absence of ESI or metadata is not surprising because the Addendum was actually created in 2014, not 2012.

Moreover, Defendants also contend that Ms. Munive's signature on the declaration is "radically different" than her signature on the Addendum. They submitted a side-by-side comparison of the two signatures in support of this position.

---

[15]    Defendants also argue that Plaintiff's failure to maintain such documents and ESI, created less than 4 months before filing its Complaint in this case [ECF No. 1] and after signing multiple tolling agreements [ECF No. 161-1, pp. 12-32], constitutes spoliation of evidence and warrants an adverse inference. This is discussed further below.

[ECF No. 338-2]. In its now-withdrawn Motion to Strike Defendants' Proposed Order [ECF No. 353], however, Plaintiff argues that the signatures are different because one of the two purported signatures is not a signature at all -- it is her initials on the Addendum. The Undersigned is not making any findings or reaching any conclusions about the handwriting comparison.

There are unquestionably many circumstances surrounding the Addendum which could be fairly described as suspicious. However, Plaintiff has submitted Mr. Fraiz's testimony and the declarations of two Venezuelan witnesses. If believed, this testimony would provide a reasonable explanation of the circumstances which Defendants point to as badges of fraud.

But there is another reason to now reject the Defendants' crime-fraud theory on the fabricated Addendum argument: if fraudulently created in 2014, the purportedly bogus document would not have been linked to the 2011 through 2013 privileged communications at issue in the RAL subpoena response. There is no evidence that Ms. Garcia or anyone else at RAL assisted or advised Fraiz (or anyone else, for that matter) to prepare the Addendum in 2014 and to falsely represent that it was created in 2012. Thus, Defendants have not met either of the two prongs necessary to establish the crime-fraud exception.

However, this ruling does not mean that the issue of the Addendum's legitimacy is now *irrelevant.* This Order does not preclude Defendants from asserting their "The-Addendum-Is-Fraudulent" argument at trial.

### C.  Defendants' Waiver Theories

#### 1.  Waiver by Voluntary Disclosure

Defendants maintain Plaintiff waived any privilege with respect to communications with RAL due to Plaintiff's voluntary disclosure of privileged RAL communications and work product. A party's intentional sharing of privileged documents and information with third parties waives the privilege "to all attorney-client communications relating to the same subject matter." *QBE Ins. Corp. v. Jorda Enters., Inc.*, 286 F.R.D. 661, 666 (S.D. Fla. 2012); *see also Cheeves v. S. Clays, Inc.*, 128 F.R.D. 128, 129 (M.D. Ga. 1989) ("disclosure . . . constitutes waiver of the privilege [of all] communications on the same subject matter"). Ample evidence demonstrates that Plaintiff intentionally and repeatedly disclosed attorney-client communications and work product to third parties.

First, Plaintiff shared a 16-page letter prepared by the Feldman Gale law firm (the "Feldman Gale Letter"), containing in-depth legal and factual analysis of the claims in this case with Somos. [Ex. 20; ECF No. 324, pp. 61-62, 78-81]. Notably, the Feldman Gale Letter also referenced Ms. Garcia's input on the analysis and investigation of the claims. *Id.* (noting Ms. Garcia's analysis of expert witness strategy and participation in a lengthy interview of Kiko Olivieri, an author of *Maria Maria*). Likewise, Plaintiff directed RAL to freely communicate with Somos regarding the nature and analysis of the claims in this action and their potential impact on Plaintiff's negotiations with

21

Televisa and to share information about the lawsuit, including the Feldman Gale Letter. [ECF No. 324, pp. 78-79].

In addition, Plaintiff's current counsel repeatedly communicated with Somos regarding Plaintiff's failure to cooperate in discovery and forwarded copies of confidential communications with his client and his client's agents. [ECF No. 296-3]. Thus, Plaintiff waived any privilege related to its noncompliance with its discovery obligations.

Therefore, the Court finds that Plaintiff waived the attorney-client privilege.

Having found a waiver by purposeful disclosure to third parties, the Undersigned now needs to determine the scope of the waiver. Courts determining the scope of a subject matter waiver in a particular case consider factors such as: (1) the general nature of counsel's assignment; (2) the extent to which counsel's activities in fulfilling the assignment are undifferentiated and unitary or are distinct and severable; (3) the extent to which the disclosed and undisclosed communications share, or do not share, a common nexus with a distinct activity; (4) the circumstances in and purposes for which disclosure was made originally; (5) the circumstances in and purposes for which further disclosure is sought; (6) the risks to the interests protected by the privilege if further disclosure were to occur; and (7) the prejudice which might result without disclosure. *United States v. Skeddle*, 989 F. Supp. 917, 918-19 (N.D. Ohio 1997).

Here, as noted above, the waiver is for the same subject matter. The subject matter of the Feldman Gale Letter is analysis of the copyright violation claim; the

subject of trial counsel's communications is locating documents and responding to discovery requests.

Most of the privileged documents do not directly relate to these two subjects. It is somewhat difficult for the Court to reach firm conclusions about all the purportedly privileged documents because most of them are in Spanish and Plaintiff did not also submit English translations (as it does not have them). Therefore, the Undersigned's analysis of which documents must be turned over because they concern the same subject matter as the waiver is based on the descriptions of the privileged documents in the privilege log and a review of the Spanish language documents filed under seal.

Based on this somewhat problematic review, the Court finds that Plaintiff must produce the following privileged documents from the RAL production: [16]

    a.    **RAL 254**: October 3, 2010 email, re: "Copyright" (email from Peggy Garcia to Mr. Fraiz; only a portion of the second email on RAL 254 was not previously produced).

    b.    **RAL 358:** August 12, 2011 emails, re: "CONSULTATION WITH TORRES PLAZ & ARAUJO LEGAL" (email from Peggy Garcia to Mr. Fraiz, and email from Mr. Fraiz in response; both emails at RAL 358 must be produced).

---

[16]    Although the subpoena was served on RAL, that law firm located the responsive documents and provided them to Plaintiff's trial counsel, who in turn prepared the privilege log.

   c.  **RAL 141:** August 19, 2011 and August 26, 2013 emails, re: "CESION

DE DERECHOS" (email from Mr. Fraiz to Peggy Garcia, and email from Peggy Garcia

to Mr. Fraiz, CC-ing Robert Allen; both emails at RAL 141 must be produced).

   d.  **RAL 265:** July 12, 2012 emails, re: "MARIA MARIA U.S.

COPYRIGHT" (email from Peggy Garcia to Mr. Fraiz, CC-ing Robert Allen, and email

from Mr. Fraiz to Peggy Garcia; both emails at RAL 265 must be produced).

### 2. "At-Issue" or "Sword/Shield" Waiver

   In addition to their other waiver arguments, Defendants maintain Plaintiff

further waived applicable privileges by putting certain matters "at issue" in a

prejudicial manner. This argument does not contain significant analysis, either in

Defendants' proposed order [ECF Nos. 338, pp. 14-15; 359-1, pp. 14-15], where it is only

discussed in a single paragraph, or in Defendants' Memorandum of Law concerning the

RAL Subpoena [ECF No. 242, pp. 12-13], which contains only approximately one page

of legal argument on this waiver theory.

   "At issue" waiver applies where a party "injects into the case an issue that in

fairness requires an examination of otherwise protected communications." *Cox*, 17 F.3d

at 1419. At this stage, Plaintiff has met its initial burden of showing the RAL documents

in question are privileged, but Defendants have *not* met their burden to make a prima

facie case of "at issue" waiver. *In re Grand Jury Proceedings*, 73 F.R.D. 647, 652 (M.D. Fla.

1977); *Genentech, Inc. v. Insmed Incorporation*, 442 F. Supp. 2d 838, 840 n.2 (N.D. Cal. 2006)

(once a party presents evidence that otherwise responsive documents are protected by

the attorney-client privilege, the burden shifts to the other side to present evidence of waiver).

The Undersigned does not find that there has been any "at-issue" waiver here. Defendants argue that Plaintiff "repeatedly suggested that its former counsel was at all times aware of the Transfer Documents and agreed that they were irrelevant and non-responsive to multiple discovery requests and Court Orders . . . [but that] the Hearing revealed this position to be false." [ECF No. 338, p. 14]. However, even if this is true, it has no bearing on the withheld RAL documents -- Plaintiff has not put *those* documents, or issues purportedly discussed in those documents, at issue. The privileged documents do not concern discovery.

Defendants also argue that Plaintiff's counsel elicited testimony at the Hearing about attorney-client communications, and in so doing put those documents at issue. However, in the Undersigned's view, those limited questions do not give rise to full "at issue" waiver of all documents withheld from the RAL production on the basis of privilege. Instead, any such waiver would only be co-extensive with that already found by way of voluntary disclosure, as outlined above. In any event, the Undersigned is not persuaded by Defendant's "at issue" waiver argument and does not find there has been any "at issue" waiver here.

### III.    Conclusion

The Undersigned does not find that the crime-fraud exception or "at-issue" waiver apply here. However, the Undersigned does find that Plaintiff has waived any applicable attorney-client privilege by purposely and voluntarily disclosing privileged information to parties outside the scope of the privilege. The scope of that waiver is limited to analysis of Plaintiff's copyright violation claim against Defendants and certain discovery-related issues (locating responsive documents and responding to discovery requests). Plaintiff must produce the four RAL documents related to these subjects (RAL 254, RAL 358, RAL 141, and RAL 265) to Defendants on or before November 5, 2014. The Court will address the discovery violations[17] in a further Order on the separately-filed motion to dismiss.

**DONE AND ORDERED** in Chambers, in Miami, Florida, November 3, 2014.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to**:
All Counsel of Record

---

[17]    Defendants do not suggest that Mr. Sammataro or his law firm were engaged in any discovery misconduct. The evidence demonstrated that they were never provided with information or documents about the Transfer Documents or the Addendum, so they cannot be faulted for failing to produce discovery about these events.