UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 12-22539-CIV-GOODMAN

[CONSENT CASE]

LATELE TELEVISION, C.A., a Bolivarian
Republic of Venezuela corporation,

     Plaintiff,

v.

TELEMUNDO COMMUNICATIONS
GROUP, LLC, et al.,

     Defendants.

_____/

## OMNIBUS ORDER ON *DAUBERT* MOTIONS

In this lawsuit involving claims that Defendants infringed the copyright of a telenovela named "Maria Maria," the parties have filed *Daubert*[1] motions seeking to exclude the other side's expert witnesses. For the reasons outlined below, the Undersigned **denies** all three motions [ECF Nos. 229; 231; 232].

By way of summary, however, the challenges to the experts' opinions relate primarily to the *weight* of the expert opinions, not their *admissibility*. The parties will have ample opportunity to pursue their challenges at trial through vigorous cross-examination and impeachment. Although *Daubert* and its progeny require the Court to

---

[1]     *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

serve as "gatekeepers" for the admissibility of expert opinion testimony, they do not mandate that the analysis focus on the substance of the conclusions -- only the qualifications, methodology and helpfulness of the expert and the expert's opinions. The movants say they are challenging qualifications and methodology, and they do, to some extent, but the experts' qualifications and methodologies are sufficient to permit a fact-finder to evaluate them.

## I.    Factual Background

Plaintiff, Latele Television C.A. ("Latele"), contends that Telumundo Communications Group, LLC and the other defendants (together, "Telemundo") infringed their copyright to *Maria Maria* ("*Maria Maria*," or "MM"), a Spanish-language soap opera or telenovela, through their *El Rostro de Analia* ("*El Rostro*" or "ERA") telenovela. Latele alleges different types of copyright infringement. The works at issue are 198 episodes of television programming allegedly owned by Latele, originally airing in 1989, and 178 episodes of television programming allegedly aired by Defendants. Latele alleges that Defendants hired an author of *Maria Maria* to develop *El Rostro.* Latele alleges that the copyright infringement is so obvious that the public and press have designated *El Rostro* as a remake or retelling of *Maria Maria.*

The written text Plaintiff deposited with the U.S. Copyright Office in connection with its application for copyright registration amounts to 5,138 pages, in Spanish. MM contains approximately 4,787 scenes, dozens of characters and multiple sub-plots. ERA

contains approximately 5,125 scenes, scores of characters and multiple sub-plots. The ERA scripts, in Spanish, are 5,848 pages.

In an effort to support its claim, Latele retained Professor Tomas Lopez-Pumarejo ("Lopez"), who has two doctorates in literature, one from the University of Valencia, Spain, and one from the University of Minnesota. The theses that he defended at these universities applied narrative theory to the analysis of television serial dramas, and, in particular, telenovelas. He also published (in 1987) what he says is the first academic book on telenovelas. His assignment in this case was "to perform a detailed literary analysis comparing the script of *Maria Maria* to the audiovisual production of *El Rostrol de Analia (ERA)."* [ECF No. 261-1, p. 3]. In his initial report, Lopez concluded that "the similarities between MM and ERA are substantial and in some instances strikingly similar." [*Id.* at p. 26]. In his Supplemental Report, Lopez concludes that the video he received from Latele's counsel, comparing ERA and *Maria Maria,* "leaves – in my opinion – no doubt that ERA is a remake of MM."[ECF No. 261-2, p. 2].

Defendants also retained an expert to compare *Maria Maria* and *El Rostro* -- Dr. Carolina Acosta-Alzuru, a Ph.D. who is an associate professor at the Grady College of Journalism and Mass Communications at the University of Georgia. Her doctorate and master's degree are in mass communication. She has published a book and many journal articles about Venezuelan telenovelas, and she has given many conference presentations on the topic, as well. The stated purpose of her analysis, as listed in her

expert report, was to ascertain whether *El Rostro* is "similar" to *Maria Maria*. In her opinion summary, Acosta explained that the dissimilarities between the two telenovelas "in terms of core plot development, triangle structure, character design, telenovela subgenre and qualitative characteristics of dialogue far outweigh the limited similarities in the triggering plot." [ECF No. 229-2, p. 2].

Defendants also retained Ben Sheppard to rebut the report of Steven Berwick, who Latele retained to opine on the magnitude of Defendants' profits. A CPA with more than 20 years of experience in the entertainment business, Sheppard was asked by Defendants to review and analyze Berwick's expert report and to form his own opinion on the extent of reasonable deductions from gross revenue necessary to determine Telemundo's net profits from ERA. Defendants also asked Sheppard to calculate an apportionment of Telemundo's profits between Latele's alleged protected elements and non-infringing elements, assuming liability.

Defendants have not filed a *Daubert* motion to exclude Berwick's opinions. They did, however, file an omnibus motion *in limine* [ECF No. 230], in which they seek to exclude Berwick's testimony about Latele's actual damages, attribution and apportionment. The Court will consider Defendant's arguments about Berwick when it evaluates, in a separate order, the *in limine* motion. Sheppard's opinions are significantly different than Berwick's and result in significantly different damages figures.

4

## II.   The Specific *Daubert* Challenges

### a.   Plaintiff's Challenge to Dr. Acosta

In its motion to exclude [ECF No. 229] Acosta as an expert witness on liability, Latele challenges both her qualifications and her methodology and also contends that her testimony would not assist the trier of fact.

Latele argues that Acosta lacks the requisite credentials and qualifications because she has never written a telenovela, is not a literary expert, considers telenovelas media products made for a commercial genre and is not sufficiently familiar with key elements used for copyright infringement analysis. Defendants disagree, describing Acosta as "among the most distinguished and accomplished telenovela experts in the world." [ECF No. 262, p. 8]. They note that the United States government earlier this year sought out Acosta and asked her to give a series of lectures to U.S. State Department officials in Venezuela on various topics related to her study of telenovelas.

### b.   Defendants' Challenge to Tomas Lopez-Pumarejo

In their motion to exclude [ECF No. 232] Lopez as an expert witness on liability, Defendants challenge his methodology and the nature of his opinion:  they say he is offering impermissible legal conclusions.

Defendants contend that Lopez's methodology is insufficient to permit opinion testimony because he reviewed only a small percentage of either of the two works at issue and therefore cannot opine on whether the works are "substantially similar." In

his deposition, Lopez confirmed that he reviewed only 33 of the 198 Spanish scripts of *Maria Maria* and only 53 of the 178 episodes of *El Rostro*. They also challenge his approach because they say his opinion is based upon uncopyrightable *scenes a faire* or other unprotected elements. Finally, they say that Lopez's opinion -- that the two works are "substantially similar" -- is an inadmissible legal conclusion on the ultimate issue in the case.

Not surprisingly, Latele disagrees. Latele argues that Defendants confuse the expert's role in analyzing works in a copyright infringement case. It says the expert is not supposed to determine substantial similarity. Latele explains that the expert's opinion should dissect the works into the elements of a copyrighted work in order to help the *fact finder* determine substantial similarity. It contends that Lopez did not rely on uncopyrightable elements and notes that individual elements of a literary work which are not individually protectable may still be protectable taken together when placed in an original selection or arrangement. Finally, Latele describes Defendants' "impermissible-legal-conclusion" argument as ambiguous and argues that Defendants' actual gripe is a challenge to the sufficiency of the data reviewed or the methodology.

c.  **Plaintiff's Challenge to Ben Sheppard**

In their motion to exclude [ECF No. 231] Sheppard as an expert witness on an aspect of the damages calculation, Latele attacks the methodology, describes the opinions as speculative and brands the conclusions as not useful to the fact finder.

Specifically, Latele argues that Sheppard deduced unavoidable expenses or fixed costs in his infringement damages calculation. Because Sheppard has never proffered expert damages testimony in copyright matters before this case and relied on information received from Acosta, Latele deems his opinion to be speculative and a case of "the blind leading the blind." [ECF No. 231, p. 10]. Latele also contends that Sheppard's opinions will be unhelpful because the fact finder would still not know the amount of Defendants' profits from the allegedly infringing *El Rostro* that are not attributable to their infringement of *Maria Maria*.

Defendants oppose the motion to exclude, arguing that Sheppard has more than sufficient experience to provide expert opinion testimony. First, Defendants note that Sheppard has been engaged "multiple times" as an expert in copyright infringement cases and argue that his experience is far greater than Latele's expert, Berwick. [ECF No. 263, p. 3]. In addition, they stress that the experts agree on basic principles of damages calculation but candidly concede that they disagree on the methodology used to determine which categories of indirect expenses are appropriate to deduct. They note that Sheppard's methodology has been accepted and that a leading treatise on the role of the financial services expert explains that "no consensus among courts exists as to which costs one should deduct in non-patent intellectual property cases." [*Id.* at p. 8]. As for Latele's claim that Sheppard's expert opinion testimony will not be useful, Defendants say that courts accept expert testimony presenting multiple damages

estimates based on different scenarios. They also highlight the notion that only a "reasonable approximation" of Defendants' profits is required. [*Id.* at p. 11].

### III.    Legal Analysis

The admission of expert testimony is governed by Federal Rule of Evidence 702, as explained and refined by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). Under this framework, district courts are charged with a gatekeeping function "to ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).

To fulfill its obligation under *Daubert*, a trial court engages in a three-part inquiry and considers whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.'" *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-1292 (11th Cir. 2005) (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir.1998)).

Although there is inevitably some overlap among these three basic factors of qualifications, reliability and helpfulness, they are distinct concepts and should not be

8

merged together. *See generally United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

The second area of inquiry referenced above requires "an exacting analysis of the proffered expert's methodology." *McCorvey*, 298 F.3d at 1257. That analysis takes into consideration a number of factors, including: (1) whether the expert's methodology can be, and has been, tested; (2) whether the expert's scientific technique has been subjected to peer review and publication; (3) whether the method employed has a known rate of error; and (4) whether the technique is generally accepted in the scientific community. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK, Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003); *Rink*, 400 F.3d at 1292. These factors, however, are **non-exhaustive**. *Kumho Tire*, 526 U.S. at 150; *Rink*, 400 F.3d at 1292. Thus, "[i]n evaluating the reliability of an expert's method . . . . a district court may properly consider whether the expert's methodology has been contrived to reach a particular result." *Rink*, 400 F.3d at 1293 n.7 (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997)).

The burden of establishing the reliability of an expert's opinions rests on the proponent of that expert's testimony. *United States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004).

As part of its gatekeeper role, the district court has "broad discretion in determining whether to admit or exclude expert testimony, and its decision will be disturbed on appeal only if it is manifestly erroneous." *Evans v. Mathis Funeral Home*,

996 F.2d 266, 268 (11th Cir. 1993) (citing, *inter alia*, *Salem v. United States Lines Co.*, 370 U.S. 31, 35 (1962)). "To warrant or permit the use of expert testimony, two conditions must be met: first, the subject matter must be closely related to a particular profession, business or science and not within the common knowledge of the average layman; second, the witness must have such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." *Faircloth v. Lamb-Grays Harbor Co.*, 467 F.2d 685, 694 (5th Cir. 1972)(internal quotation omitted).

The three-part inquiry used to determine admissibility of expert testimony under Rule 702 involves a more refined approach in copyright infringement cases.

In the context of copyright infringement cases involving works of art, several courts have noted that there simply is no particularized or defined expertise, qualification or training that qualifies an individual to render a reliable opinion in analyzing and comparing two narrative works. *See, e.g.*, *Bernal v. Paradigm Talent and Literary Agency*, 788 F. Supp. 2d 1043, 1062, n14 (C.D. Cal. 2010); *Engenium Solutions, Inc. v. Symphonic Techs., Inc.*, 924 F. Supp. 2d 757, 770 (S.D. Tex. 2013) (denying motion to exclude expert based on qualifications even though expert did not have any experience in comparing works at issue); *Jeff Benton Homes v. Alabama Heritage Homes, Inc.*, 929 F. Supp. 2d 1231, 1240 (N.D. Ala. 2013) (architect qualified as expert based on his many years of experience in analyzing substantial similarities of two floor plan designs even

though architect never designed any in homes in the relevant market). Indeed, the

*Bernal* court specifically noted, in denying *Daubert* motions in a copyright infringement

case involving television scripts, that:

> [T]*here is no particular type of background that qualifies one to compare a*
> *screenplay to television scripts*. . . . [T]he analysis required is not highly
> technical. . . . [T]he analytic task is to compare standard elements—plot,
> characters, dialogue, mood, setting, and so forth—for substantial
> similarity. Thus, while a person with a great deal of experience writing
> literary works and reading manuscripts or television scripts certainly has
> the necessary background, an avid movie buff and television watcher
> might also be qualified to render an opinion in this case.

*Bernal*, 788 F. Supp. 2d at 1062, n14.

As courts have noted, the *Daubert* standard, which arose in the context of

scientific or mathematical research and analysis, is often difficult to apply in the context

of copyright infringement involving expressive or artistic work. *See, e.g., Watt v. Butler*,

744 F. Supp. 2d 1315, 1320 (N.D. Ga. 2010). In this context, the court's primary role in

addressing an expert's methodology is whether "basing testimony upon professional

studies or personal experience, [the expert] employs in the courtroom the same level of

intellectual rigor that characterizes [her practice] in the relevant field." *Kumho Tire Co.*,

526 U.S. at 152.

Generally, if an expert utilizes methods that are consistent with his or her

scholarship and research in the particular field, courts will find the methodology

sufficiently reliable under *Daubert. See, e.g., Watt*, 744 F. Supp. 2d at 1320 (expert's

methodology in analyzing substantial similarity in copyright infringement case held

sufficiently reliable under *Daubert*, where method was consistent with that used in expert's professional studies).

Moreover, Courts do not rigidly adhere to classifications when evaluating expert testimony that in essence amounts to simply comparing the elements of one story to another. *See, e.g., Gable v. Nat'l Broad. Co.*, 727 F. Supp. 2d 815, 834, n.14 (C.D. Cal. 2010) ("The Court is using the term 'literary works' loosely to relate to the type of works at issue in this case – a screen play and a television series – and their analogs such as motion pictures and books. . . . The Court recognizes that, under the Copyright Act, a movie or television series would fall into the category of an audiovisual work, whereas a book or screenplay would be categorized as a literary work. 17 U.S.C. §102(a)(1), (a)(6)."); *Bernal*, 788 F. Supp. 2d at 1061 (expert's background in publishing sufficient to render opinion on substantial similarity of two manuscript works); *Stewart v. Wachowski*, 574 F. Supp. 2d 1074, 1106 n.130 (C.D. Cal. 2005).

Thus, no particular "literary" expertise is required to analyze and compare the constituent elements of a narrative work, *e.g.*, plot, characters, pace, mood and dialogue. Numerous courts have found academics, critics, or professionals with industry experience in a particular genre of popular entertainment qualified under *Daubert* to render expert opinions comparing the similarities and dissimilarities in two works. *See, e.g., Watt*, 744 F. Supp. 2d at 1320; *Bernal*, 788 F. Supp. 2d at 1061.

An expert engaged in analytical dissection of the elements of a narrative work need not attempt to segregate out with mathematical precision what particular aspects of each particular element might be considered protectable expression versus unprotectable, general plot ideas or *scenes a faire*. Indeed, the Eleventh Circuit specifically noted the difficulties and imprecision inherent in attempting to segregate out unprotected "ideas" from protected "expression" of a particular idea. *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 460 (11th Cir. 1994) ("[Plaintiff] contends that the district court erred in finding insufficient similarities in these aspects [plot, mood, characterization, etc.]. We will examine each aspect independently. . . . *We keep in mind the practical difficulty of drawing a bright line between idea and expression . . .*") (emphasis added) (citing *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960) (L. Hand, J.)).

To establish copyright infringement, a party must show (a) valid ownership of a copyright and (b) copying of constituent elements of original expression subject to copyright protection. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Copying may be proved by demonstrating the defendant had access to the plaintiff's work and the two works are "substantially similar." *Benson v. Coca-Cola Co.*, 795 F.2d 973, 974, *reh'g denied,* 801 F.2d 404 (11th Cir. 1986). In the Eleventh Circuit, expert testimony on the issue of substantial similarity in copyright infringement cases is admissible.

13

In *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1257 (11th Cir. 1999), the

Eleventh Circuit explained the substantial similarity test as follows:

> Under the extrinsic test, a court will inquire into whether, as an
> objective matter, the works are substantially similar in protected
> expression. As a part of this test, a court will determine whether
> a plaintiff seeks to protect only uncopyrightable elements; if so,
> the court will grant summary judgment for [the] defendant.
> Under the extrinsic test, expert testimony and analytic dissection
> are appropriate. Under the intrinsic test, a court will determine
> whether, upon proper instruction, a reasonable jury would find
> that the works are substantially similar. A court may grant
> summary judgment for defendant as a matter of law if the
> similarity between the two works concerns only noncopyrightable
> elements of the plaintiff's work or if no reasonable jury would
> find that the two works are substantially similar.

(internal citations omitted).

Expert testimony falls under the extrinsic prong of the substantial similarity

test, given the appropriateness of analytical dissection. *See Herzog,* 193 F.3d at

1257. Analytical dissection ultimately requires breaking the works into their

constituent elements and comparing those elements for proof of copying. *See Swirsky*

*v. Carey*, 376 F.3d 841, 845 (9th Cir. 2004). For authored works, such as books, films,

and television shows, the constituent elements include "plot, themes, dialogue,

mood, setting, pace, characters and sequence of events." *Metcalf v. Bocho*, 294

F.3d 1069, 1073 (9th Cir. 2002).

Concerning the issue of apportionment (i.e., determining which elements of

profits are not attributable to the alleged infringement), courts have explained that it

14

need not be proven with "mathematical exactness but only a reasonable approximation." *Sheldon v. Metro-Goldwyn Pictures Corp.,* 309 U.S. 390, 397-398; 408 (1940). In *Sheldon,* the Supreme Court adopted the holding of *Dowagiac Mfg. Co. v. Minnesota Moline Plow Co.,* a patent infringement case which the Court found to be analogous, noting that:

> In the *Dowagiac* case, we again referred to the difficulty of making an exact apportionment and again observed that mathematical exactness was not possible. What was required was only 'reasonable approximation' which usually may be attained 'through the testimony of experts and persons informed by observation and experience'. Testimony of this character was said to be 'generally helpful and at times indispensable in the solution of such problems'. The result to be accomplished 'is a rational separation of the net profits so that neither party may have what rightfully belongs to the other'.

390 U.S. at 404 (emphasis added) (quoting *Dowagiac,* 235 U.S. 641, 647 (1915)). Thus, the Court affirmed an apportionment of the defendants' profits based on "the testimony of **experts** and persons informed by observation and experience." *Id.* (emphasis added and internal quotation marks omitted).

There is no doubt that the three *Daubert* motions all generate significant challenges to the proposed expert testimony. Nevertheless, the Undersigned deems the legal assaults to relate more to the weight of the experts' opinions and to their credibility, rather than the threshold issue of admissibility. *Daubert,* 509 U.S. at 595 ("the focus [of the inquiry into the validity and evidentiary relevance and reliability of the

expert opinion testimony], of course, must be solely on principles and methodology, not on the conclusions that they generate").

The Court's gatekeeper role is not intended to supplant the adversary system or the jury's role because, as *Daubert* explained, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. *Cf. Adams v. Lab. Corp. of Am.*, 760 F.3d 1322, 1335 (11th Cir. 2014) (reversing order granting defendant laboratory's motion to exclude expert's testimony and vacating judgment in defendant's favor, and noting that "shakiness" of an expert's testimony because of possible bias "goes to the weight of [the] testimony, not its admissibility"). *See generally, Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) (reversing judgment on jury verdict for defendant because trial court committed reversible error by excluding testimony from plaintiff's expert about the safety of defendant's choice of flooring and explaining that the trial court's role is not "to make ultimate conclusions as to the persuasiveness of the proffered evidence") (internal quotation omitted).

Defendants' primary challenge to Lopez's proposed expert testimony is that he did not review a sufficient number of the two works in this case. This alleged deficiency may well generate fodder for fruitful cross-examination but the Undersigned views the objection insufficient to support a request to flat-out exclude his testimony. *Oceania*

*Cruises*, 654 F.3d at 1193 ("in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility").[2]

At trial, Defendants will be able to question Lopez about his less-than-complete review of the two works, and this cross-examination, which the Undersigned anticipates will be rigorous, should be sufficient protection. *Quiet Tech, DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11th Cir. 2003) (affirming district court's decision to admit expert witness testimony from an expert in computational fluid dynamics and noting that "[n]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility") (internal quotation omitted). *See also Bazemore v. Friday,* 478 U.S. 385, 400 (1986) ("normally, failure to include variables [in a regression analysis] will affect the analysis' probativeness, not its admissibility").

Likewise, Plaintiff's effort to exclude Acosta's expert opinion is similar to the Lopez challenge because Defendants demonstrated a sufficient foundation for her conclusions and because the alleged flaws can be adequately addressed by cross-examination. *Maiz v. Virani,* 253 F.3d 641 (11th Cir. 2001) (rejecting challenge to plaintiffs' expert witnesses in civil RICO case brought by investors-partners in real estate venture and affirming $18.234 million judgment).

---

[2]     The Court quoted from the opinion in *Hemmings v. Tidyman's, Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002), where the Court also explained that "vigorous cross-examination of a study's inadequacies allows the jury to appropriately weigh the alleged defects and reduces the possibility of prejudice." (internal citations omitted).

Acosta is the only proffered expert in the case who actually viewed and analyzed all 376 hours of the audiovisual productions of the two telenovelas. She prepared recaps of each episode as they were viewed, re-read the recaps and produced diagrams to summarize the plot of each of the two works. The mere fact that she has not written a telenovela herself is insufficient to preclude her expert testimony. *Jeff Benton Homes,* 929 F. Supp. 2d at 1240 (qualifying architect as an expert even though he never designed any homes in the relevant market); *Bernal,* 788 F. Supp. 2d at 1061-62 (C.D. Cal. 2010) (experience in reviewing and comparing hundreds of manuscripts is sufficient to qualify expert to analyze the works involved in the case and noting that an avid movie buff and television watcher might also be qualified to render an opinion about the comparison of screenplays).

For the same reason, Acosta is not subject to exclusion as an expert merely because she is not a "literary expert" or an expert on copyright infringement. *Watt,* 744 F. Supp. 2d at 1320 (denying defendant's motion to exclude expert ethnomusicologist in copyright infringement action filed against rap music artists for copyright infringement and rejecting argument that his opinion focuses too heavily on the similarities between the two songs while disregarding the differences in rhythm and context). Moreover, Acosta carefully addressed the existence of unprotectible *scenes a faire* even though she did not use that specific term. Latele can certainly question her at trial, if there is one, about her unfamiliarity with the term, but it has not convinced the Undersigned that

18

Acosta's unfamiliarity with a few legal terms is reason enough to exclude her, especially given her substantial background in telenovela analysis.

Given that there is no definitive methodology for determining which costs should be deducted in non-patent intellectual property cases, Latele's challenge to Sheppard, a CPA with extensive experience in the entertainment industry, is one which relates to the weight of his opinions, not admissibility. To the extent that Latele contends that its expert's approach is the more-recognized one, this argument can be addressed in an appropriate jury instruction, designed to prevent a jury from placing too much weight on an expert's opinion. *Maiz v. Virani*, 253 F.3d at 667-68; *United States v. Gold*, 743 F.2d 800, 817 (11th Cir. 1984).

To be sure, Latele contends that Sheppard's calculations are inaccurate and based on improper approaches to classifying items for financial analysis. But the "identification of such flaws" is "precisely the role of cross-examination." *Quiet Tech. DC-8*, 326 F.3d at 1345.

### IV.   Conclusion

The Undersigned **DENIES** all three *Daubert* motions.

**DONE AND ORDERED** in Chambers, in Miami, Florida, December 15, 2014.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

19

**<u>Copies furnished to</u>**:
All Counsel of Record