UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 12-22539-CIV- GOODMAN

**[Consent Case]**

LATELE TELEVISION, C.A.,

       Plaintiff,

v.

TELEMUNDO COMMUNICATIONS
 GROUP, LLC, et al.,

       Defendants.

_____/

## ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In the instant copyright infringement case, Defendants[1] seek summary judgment

against Plaintiff, Latele Television, C.A. ("Plaintiff" or "Latele"), on the issue of alleged

infringement of the copyrighted work at issue, a Venezuelan telenovela named "*Maria*

*Maria*." In their motion [ECF No. 175], Defendants ask the Court to conclude that no

reasonable jury could find the two works at issue ("*Maria Maria*" and "*El Rostro de*

*Analia*" ("*ERA*"), another Venezuelan telenovela), to be "substantially similar" as a

---

[1]     The Defendants in this action include Telemundo Television Studios, LLC,
Telemundo Studios Miami, LLC, Telemundo Network Group, LLC, Telemundo
Internacional, LLC. Together, the Defendants are either referred to as "Defendants" or
"Telemundo" in this Order.

matter of law. The Undersigned has reviewed the motion, Plaintiff's response [ECF No. 191], Defendants' reply [ECF No. 210] and each side's statement of undisputed material facts [ECF Nos. 173; 190]. In addition, the Undersigned has viewed highlight reels of purported similarities and differences between the two works and also held a multi-hour hearing. [ECF No. 398].

The Undersigned **denies** the motion but notes that Defendants may again (if the facts developed -- or not developed -- at trial support such a motion) assert these arguments at trial in a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50.

Defendants assert several arguments to support their view that there is no substantial similarity between the works: (1) all of the applicable elements of the two works -- plot, characters, pace, theme, setting, and sequence of events -- are different and the differences far outweigh the limited similarities; (2) the "vast majority" of the "scattered similarities" flagged by Latele are not protectable because they amount to standard or stock elements (i.e., they are *scenes a faire*); (3) "many" of the purported similarities which Latele relies upon are "factually incorrect;" (4) after filtering out the unprotected *scenes a faire*, the remaining "handful" of alleged similarities are, at best, de minimis and do not meet the substantial similarity threshold; (5) Latele no longer owns the copyright and lacks standing to pursue its trademark claims; and (6) Latele never produced certified translations of *Maria Maria*.

The Court will not consider the sixth argument because Defendants raised it for the first time in their reply. Raising an argument in a reply does not provide the opposing party an opportunity to address the newly-raised contention. *See* Local Rule 7.1(c), Local Rules of the Southern District of Florida ("reply memorandum shall be strictly limited to rebuttal of matters raised in the memorandum in opposition"); *see also Tallahassee Mem'l Reg'l Med. Ctr. v. Bowen*, 815 F.2d 1435, 1446 n. 16 (11th Cir. 1987) (finding that a single footnote in an initial brief did not preserve an issue and noting that "it is well settled that a party cannot argue an issue in its reply brief that was not preserved in its initial brief").

In addition, the Court will not at this time consider the fifth argument because the issue of ownership is still very much in dispute and is in fact one of the most vigorously litigated issues in this case. Indeed, the Court permitted Defendants to take additional discovery on the ownership issue. That discovery is ongoing, and the Court very recently held a hearing in which Defendants requested additional time to complete that discovery.[2] [ECF No. 419]. Defendants may file another summary judgment motion

---

[2]     In fact, although the Undersigned recently denied Defendants' motion to dismiss (which asserted the argument that Latele did not own *Maria Maria* when it filed this lawsuit), the Order denying that motion expressly noted that "Latele will need to establish at trial its standing to pursue the lawsuit. In other words, it will need to prove that it exclusively owned the rights to *Maria Maria* on the day it filed the lawsuit." [ECF No. 368, p. 15, n. 13]. Likewise, in analyzing the competing evidence surrounding Defendants' argument that Latele does not own the *Maria Maria* copyright because of certain purported transfers, the Undersigned described the theories as "big 'ifs'" and

on the threshold ownership issue should the additional discovery generate undisputed material facts establishing that Latele does not own the *Maria Maria* copyright and did not own it when this lawsuit was filed.

The Court will not grant summary judgment on the third ground either. Defendants' presentation about the purported inaccuracies is not sufficiently persuasive on all arguments, as Latele has provided an explanation rebutting most of the so-called inaccuracies.

Defendants' principal argument is that Latele has not (and cannot) establish substantial similarity between the two works. Although the scripts themselves are not in dispute,[3] the **evaluation** of the elements of the plot *is* in dispute and the Undersigned believes it is more prudent and more appropriate for a jury to make this fact-specific comparison. By denying Defendants' summary judgment motion, the Court is not concluding that *Maria Maria* and *ERA* **are** substantially similar. Instead, this Order signifies only that a reasonable jury *could* conclude that the two telenovelas are

specifically noted that "[t]hey cannot be resolved now because there is evidence to support both sides' positions." [ECF No. 368, p. 21].

[3]     The scripts at issue **should** not be in dispute. They are what they are and they say what they say. But Defendants contend that Plaintiff's presentation of some plot-based facts is wrong on several script-oriented points, while Plaintiff insists that *its* version is the correct one. Although there are in fact still some disputes about precise plot points, these few differences did not cause the Undersigned to conclude that material factual disputes exist, precluding summary judgment. The ruling which rejects Defendants' primary lack-of-substantial-similarity theory at this summary judgment stage is based on grounds other than the limited skirmishes about which side's plot summary is the more-correct version.

substantially similar. Of course, another reasonable jury could just as easily and rationally conclude that the protectable elements of the two works are *not* substantially similar.

### I.      Factual Background

In its Complaint, Latele alleges different types of copyright infringement by Defendants of *Maria Maria.* In particular, the works at issue are 198 episodes of the *Maria Maria* television programming allegedly owned by Latele, originally airing in 1989, and 178 episodes of the *ERA* television programming allegedly aired by Defendants.

Latele alleges that Defendants hired the author of *Maria Maria* to develop *ERA*, a telenovela which Latele alleges is so similar to *Maria Maria* that the public and press have designated it as a remake or retelling. Latele's three-count Complaint pursues claims for copyright infringement, contributory copyright infringement, and vicarious copyright infringement. [ECF No. 1, pp. 15-22].

There appears to be a slight factual dispute as to the level of involvement of author Humberto "Kiko" Olivieri, but this dispute is not material enough to alter the analysis of the arguments at issue in this summary judgment motion.

Latele contends that Oliveri is the author who wrote both *Maria Maria* and *ERA*, while Defendants partially challenge that theory. In particular, Defendants contend [ECF No. 173] that Jose Ignacio Cabrujas, a famous Venezuelan novela author, was the

primary author of *Maria Maria*. They say that Herman Perez Belisario was also a *Maria Maria* author and that Olivieri contributed to *Maria Maria* for only three months. Defendants say that neither Belisario nor Cabrujas helped Olivieri with *ERA* and they note that Olivieri has denied that *ERA* was a "remake" of *Maria Maria.*

In contrast, Plaintiff's Statement of Facts (in opposition to the summary judgment motion [ECF No. 190]) notes that Cabrujas was merely a staff writer who participated in the writing of *Maria Maria* but had no involvement in writing the "main plot," which was written completely by Olivieri. Latele notes that Cabrujas' name appears nowhere on the credits for *Maria Maria*. The United States Copyright Office lists Olivieri as the co-author of *Maria Maria* and his name appears in the opening credits of every episode. In addition, Olivieri is the author credited for *ERA*, as reflected in the opening credits of every episode.

II.    **The Parties' Positions**

The parties assert dramatically different descriptions of the two works. Defendants describe *Maria Maria* as a romance, a "typical novella." They portray the show as opening with a homemaker obsessed with revenge against a man she wrongly believes disgraced her father. After a car crash she suffers amnesia and by accident a plastic surgeon gives her another woman's face. Defendants say the story is resolved when she regains her memory, realizes her mistake and falls in love with the man.

Defendants describe *ERA* as a sci-fi-action thriller and police drama (as opposed to a romance). They construe the opening as beginning with the head of an airline company finding out that her husband has cheated on her. After a car crash, her memory is erased by a mad scientist who applies cloning techniques to give her another woman's face. She then takes on the identity of the other woman and infiltrates the mob, leading to scenes of torture and shooting. Defendants depict the end as a resolution where all the villains are jailed and the protagonist is reunited with her husband.

Latele, on the other hand, summarizes *ERA* as "nothing more than a modern version of the original work, told in a hi-tech, fast-paced setting." [ECF No. 191, p. 2]. Plaintiff emphasizes not only the similarities but the fact that they all occur in the same sequence. Latele interprets both protagonists as kind, family-oriented women from affluent urban upbringings who both initially had just one child. It depicts both as having illegitimate brothers who were abandoned by their fathers and as having unfaithful husbands whom the protagonists learn is having an affair.

Latele contends that both works have too many identical creative licenses to be dismissed as pure coincidence: (1) supposed human remains are found at the crash scene; (2) people presume without verification that the remains belong to the passenger; (3) the gun used to force the protagonist to drive mysteriously disappears; (4) the passenger is inexplicably kidnapped after being ejected from the car upon impact and

her identity -- both physically and in actual name -- are completely assumed by the surviving protagonist; (5) the face and the skin are transferred to the protagonist, who coincidentally happens to be the same exact size as the person whose identity she assumes; (7) the identifying documents found at the crash scenes are assumed without inquiry to be the driver's, not the "dead" passenger's; and (7) both the surviving victims' bodies are repaired without any residual evidence of burns or scarring or limitations of movement -- while both ejected passengers manage to survive unscathed. Latele proffers more "can't-just-be-a-coincidence" factors; the Court is not listing all of them here.

Recognizing that there are similarities between the two works, Defendants argue that virtually all of the similarities are uncopyrightable elements, such as ideas and *scenes a faire.* As analyzed against the backdrop of telenovelas, Defendants paint the similarities as common themes in the genre. For example, they say that jealousy, betrayal, amnesia, out-of-wedlock children, mistaken identities, family strife, marital conflict, the reuniting of long-lost relatives or lovers, plastic surgery, and assumed identities are "melodramatic plot elements [which] are common to the genre." [ECF No. 175, p. 6]. Therefore, Defendants say, these stock themes are no more protectable than a car-chase scene in an action movie or an alien invasion in a science fiction novel.

Latele, however, stresses that these themes, while present in other telenovelas, are organized in exactly the same sequence in both works: (a) infidelity; (b) accident; (c)

mistaken identity; (d) plastic surgery; (e) the amnesic protagonist with a different name; (f) the protagonist's best friend, and, later, her bastard brother, realize who she really is as she slowly recovers her memory; (g) the woman whose face the protagonist displayed, who supposedly died, suddenly reappears after being held captive; (h) and the protagonist is reunited with her child and loved ones and winds up marrying the man with whom she had been on bad terms with before the accident, plastic surgery, amnesia, and identity swap.

In addition to stressing myriad differences between the two telenovelas, Defendants also underscore the existence of multiple significant sub-plots and characters which exist in *ERA* but not in *Maria Maria*.

Defendants also rely on what they deem the comparatively insignificant number of similarities between the two works.  For example, they note that Latele has identified only 51 scenes (out of more than 5,100 total scenes in *ERA*) which contain elements similar to *Maria Maria*. According to Defendants, it is inconceivable that a work containing less than one percent of similar scenes would be considered to be substantially similar to the other work. Similarly, Defendants highlight the limited number of episodes which Latele identifies as containing any element or expression allegedly infringed. Specifically, Latele pinpointed only 20 episodes (out of 178) which contain similarities. Adopting a statistical approach, Defendants point out that this is only slightly more than ten percent of all episodes.

In response, Latele attacks Defendants' focus on the differences between the two works, pointing out that the analytical key should turn on the similarities between the two telenovelas, not the differences.

### III.   <u>Applicable Legal Rules</u>

The general summary judgment standard is well-established:

Summary judgment is appropriate only when the Court is satisfied that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is sufficient evidence such that a reasonable jury could return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it may affect the outcome of the suit under the governing law. *See id.* As the movants, Defendants bear the initial burden of showing, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. *See id.*

Latele can withstand summary judgment by establishing that, "based on the evidence in the record, there can be more than one reasonable conclusion as to the proper verdict." *Burton v. Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999) (internal citation omitted). The Court must afford Latele, the non-moving party, all justifiable inferences from the evidence in the record, and reasonable doubts must be resolved in its favor. *See id.* "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." *Id.* (quoting *Clemons v. Dougherty Cnty.*,

684 F.2d 1365, 1368-69 (11th Cir. 1982)). "If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." *See id.* (quoting *Clemons*, 684 F.2d at 1368-69).

An issue of fact is "material," for purposes of motion for summary judgment, if it is a legal element of the claim, as identified by substantive law governing the case, such that its presence or absence might affect the outcome of the action. *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, *reh'g en banc denied*, 974 F.2d 173 (11th Cir. 1992), *cert. denied*, 507 U.S. 911 (1993); *see also Butchkosky v. Enstrom Helicopter Corp.*, 855 F. Supp. 1251 (S.D. Fla. 1993), *aff'd without opinion*, 66 F.3d 341 (11th Cir. 1995) (in summary judgment proceedings, "material fact" is one which is "determinative of parties' duties or rights.").

A dispute is "genuine," for purposes of a motion for summary judgment, where there is evidence which would support the return of a verdict at trial by a reasonable jury in favor of the non-moving party. *Harmony Homes, Inc., v. U.S. on Behalf of Small Bus. Admin.*, 936 F. Supp. 907 (M.D. Fla. 1996), *aff'd*, 124 F.3d 1299 (11th Cir. 1997). Summary judgment may not be granted where the record reflects conflicting versions of material facts which require credibility determinations. *Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1225 (11th Cir. 1999); *Van Poyck v. Dugger*, 779 F. Supp. 571 (M.D. Fla. 1991); *see also Slusser v. Orange Cnty. Pub. Schs.*, 936 F. Supp. 895 (M.D. Fla. 1996) (in summary judgment proceedings, court may not weigh credibility of the parties, and if

determination of case rests on which competing version of the facts or events is true, case should be presented to trier of fact.)

On issues as to which the opposing party will have the burden of proof at trial, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thus, if Plaintiff, as the non-moving party, fails to make a sufficient showing on an essential element of its *prima facie* case, such as substantial similarity between the works, then the Court must enter summary judgment for Telemundo. *Oravec v. Sunny Isles Luxury Ventures L.C.*, 469 F. Supp. 2d 1148, 1160 (S.D. Fla. 2006).

In addition to following the standard rules governing summary judgment motions in general, the Court must also tailor its analysis to conform to the particular rules governing summary judgment motions in copyright infringement cases.

The elements of direct copyright infringement are: (1) ownership of a valid copyright in the work allegedly infringed; and (2) that defendant copied elements of the copyrighted work that are protected under the Copyright Act. *See, e.g., Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1290 (11th Cir. 2011).

To state a claim for copyright infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991) (internal citation omitted). In copyright infringement cases, the Court must grant summary

judgment for defendants if: "(1) the similarity concerns only noncopyrightable elements or (2) no reasonable jury upon proper instruction would find the works substantially similar." *Thompson v. Looney's Tavern Prods., Inc.*, 204 Fed. App'x 844, 849 (11th Cir. 2006) (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir. 1994)); *see also Intervest Constr., Inc. v. Canterbury Estate Homes, Inc.*, 554 F.3d 914, 920 (11th Cir. 2008) (summary judgment particularly proper in cases where crucial issue is substantial similarity and there may be substantial similarity as to *non*-copyrightable elements of the two works, but, as to protectable elements, there is substantial *dis*similarity); *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1247 (11th Cir. 1999) (non-infringement may be determined as a matter of law on a motion for summary judgment, either because the similarity between the two works concerns only non-copyrightable elements of plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar).

To show substantial similarity, a plaintiff must establish that "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Original Appalachian Artworks. Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 829 (11th Cir. 1982) (internal quotation omitted). Because substantial similarity is such a nuanced issue of fact, summary judgment is warranted only "if ___no___ **reasonable jury could differ** in weighing the evidence." *Leigh v. Warner Bros. Inc.*, 212 F.3d 1210, 1216 (11th Cir. 2000) (emphasis added).

13

Because Plaintiff asserts that all 178 episodes of *ERA* infringe the scripts of all 198 episodes of *Maria Maria,* the Court must examine the Plaintiff's work(s), and the accused work(s), as a whole, in context, rather than a handful of characterizations about certain aspects of each. *See, e.g., Bridgmon v. Array Sys. Corp.,* 325 F.3d 572, 576 (5th Cir. 2003) (finding of copyright infringement requires side-by-side comparison of the two works); *King v. Ames,* 179 F.3d 370, 376 (5th Cir. 1999) (plaintiff failed to establish infringement because she neglected to introduce copies of the works in suit for side-by-side comparison); *Beal,* 20 F.3d at 460-64.

It is well established that simply asserting that two works have a similar plot, premise, and characters is insufficient to satisfy the high burden required to establish substantial similarity for copyright infringement purposes. Indeed, courts have rejected such claims despite what appear to be, on a surface level, even striking similarities in plot, theme, characters, pace, setting, and dialogue, including even sharing the same titles or character names. *See, e.g., Beal,* 20 F.3d at 459; *Benay v. Warner Bros. Entm't, Inc.,* 607 F.3d 620, 632 (9th Cir. 2010); *Funky Films, Inc. v. Time Warner Entm't Co.,* 462 F.3d 1072 (9th Cir. 2006) (plaintiff's work shared multiple plot/premise similarities with *Six Feet Under* television program, including a family-run funeral home, father's death, return of "prodigal son" who assists brother in reviving business, and similar themes of death and sex, but nonetheless, held not to be substantially similar due to multiple differences); *Goldberg v. Cameron,* 787 F. Supp. 2d 1013, 1020 (N.D. Cal. 2011)(summary

14

judgment granted; alleged similarities concerned unprotectable elements, such as "futuristic conflict between man and machines, specifically, computers and robots" since such themes were "commonplace in science fiction").

Moreover, as Defendants stress in their summary judgment motion and reply, a plaintiff cannot prevail if it seeks to protect only uncopyrightable elements such as ideas. *Oravec*, 527 F.3d at 1224 (citing 17 U.S.C. § 102(b)) (other citations omitted).

Copyrightable expression also does not include *scenes a faire* or "sequences of events which necessarily follow from a common theme" or "incidents, characters, or settings that are indispensable or standard in the treatment of a given topic." *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1248 (11th Cir. 1999); *see also Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1266 (11th Cir. 2001); Nimmer on Copyright § 13.03[B][4] at 13-78.7 (2003) ("[T]he choice of writing about vampires leads to treating killings, macabre settings, and choices between good and evil"); *see also Beal*, 20 F.3d at 459 (because "the '*sine qua non*' of copyright is originality," noncopyrightable material includes *scenes a faire*).

Although some courts label *scenes a faire* as uncopyrightable, other courts explain that labeling certain stock elements as *scenes a faire* merely points out that the similarities between the works are "hackneyed elements" which "cannot furnish the basis for a finding of substantial similarity." *Frye v YMCA Camp Kitaki*, 617 F.3d 1005, 1008 (8th Cir. 2010). In fact, this is how one leading treatise (4 Nimmer on Copyright §

13.03[B][4] describes *scenes a faire*. But the Eleventh Circuit often describes *scenes a faire* as "not protectable" or "not copyrightable." *Herzog v. Castle Rock,* 193 F.3d at 1248.

Plaintiff must establish substantial similarity of copyrightable elements of *Maria Maria*; any elements that are staples of the genre have no copyright protection and thus must be disregarded in evaluating substantial similarity. *Oravec,* 527 F.3d at 1224.

Nevertheless, protection does cover "the pattern of the work … the **sequence** of events and the development of the interplay of characters." *Herzog,* 193 F.3d at 1249. (emphasis supplied) (internal quotation omitted).

In addition, the "particular sequence in which an author strings a significant number of **unprotectable** elements **can itself be a protectable element**." *Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002) (emphasis added) (reversing summary judgment because there was issue of fact as to whether two works were substantially similar) (J. Kozinski). "Each note in a scale, for example, is not protectable, but a pattern of notes in a tune may earn copyright protection." *Id.*; *see also Shaw v. Lindheim*, 919 F.2d 1353, 1363 (9th Cir. 1990) ("Even if none of these plot elements is remarkably unusual in and of itself, the fact that both scripts contain all of these similar events gives rise to a triable question of substantial similarity of protected expression.").

While the Eleventh Circuit has not explicitly adopted the *Metcalf* holding, or even cited the case,[4] it has not foreclosed it either, and the rule makes sense under certain scenarios. Certainly, other courts have reached similar results and seem to have embraced the approach. *Salinger v. Random H., Inc.*, 811 F.2d 90, 98 (2d Cir. 1987) opinion supplemented on denial of reh'g, 818 F.2d 252 (2d Cir. 1987) ("Though a cliche or an 'ordinary' word-combination by itself will frequently fail to demonstrate even the minimum level of creativity necessary for copyright protection, such protection is available for the association, presentation, and combination of the ideas and thought which go to make up the author's literary composition.") (internal quotations and citations omitted); *Satava v. Lowry*, 323 F.3d 805, 811 (9th Cir. 2003) ("It is true, of course, that a *combination* of unprotectable elements may qualify for copyright protection").

And District Judge Robin Rosenbaum used language which seems to support a *Metcalf* rule even though she did not cite that case or use identical language when denying Defendants' motion to dismiss.  In particular, Judge Rosenbaum held that "the sequence of events, as set forth in both works, removes the similarities from the realm of ideas and propels them into the arena of expression of ideas." *Latele TV C.A. v. Telemundo Commun. Group, LLC*, 12-22539-CIV, 2013 WL 1296314, at *10 (S.D. Fla. Mar. 27, 2013). Rejecting Defendants' argument that the similar events are standard in the

---

[4]     The Undersigned previously cited *Metcalf* in an earlier ruling issued in this case, albeit for a different rule of law. *Latele Television, C.A. v. Telemundo Commun. Group*, No. 12-22539-CIV, 2014 WL 7150626, at *7 (S.D. Fla. Dec. 15, 2014).

telenovela genre and therefore not adequate to generate a copyright claim, Judge Rosenbaum emphasized that "all of these events occur in a single work – and they all happen in **precisely the same order**." *Id.* (emphasis added). Therefore, Judge Rosenbaum concluded, "these circumstances render the details that are similar copyrightable." *Id.*

Moreover, the Eleventh Circuit has approved in other contexts the theory that unprotectable elements may obtain copyright protection if those elements are "arranged in a unique way." *Corwin v. Walt Disney Co.,* 475 F.3d 1239, 1251 (11th Cir. 2007) (internal citation omitted); *MiTek Holdings, Inc. v. Arce Eng'g Co., Inc.,* 89 F.3d 1548, 1558 (11th Cir. 1996) (acknowledging that a user interface -- a screen display -- "may be entitled to copyright protection as a compilation" if the compilation is "original and expressive"). *See generally Oravec,* 527 F.3d at 1225 ("while individual standard features and architectural elements classifiable as ideas are not themselves copyrightable, an architect's original combination or arrangement of such features may be").

Based on this authority, the Undersigned therefore finds that a plaintiff may, under certain fact-specific circumstances, base a copyright infringement claim on *scenes a faire* if the particular sequence is sufficiently unique and is copied in the same order. This does not mean that "*any* combination of unprotectable elements automatically qualifies" for copyright protection and would sustain an infringement claim. *Satava v. Lowry,* 323 F.3d 805, 811 (9th Cir. 2003). Instead, the special combination of

unprotectable elements could be eligible for copyright protection and could constitute

support for an infringement claim "only if those elements are numerous enough and

their selection and arrangement original enough that their combination constitutes an

original work of authorship." *Id.*

Although the Eleventh Circuit has in the past used the so-called

"extrinsic/intrinsic" test for determining substantial similarity," *Herzog*, 193 F.3d at

1257, the Eleventh Circuit later described the intrinsic/extrinsic approach as "not

useful" because "the two tests ultimately merge into a single inquiry: whether a

reasonable jury could find the competing designs substantially similar at the level of

protected expression." *Oravec*, 527 F.3d at 1224, n.5.

As noted above, Defendants stress the substantial differences between the two

works. But some courts have indicated that it is the similarities, not the differences,

which control:

> Plaintiff correctly asserts that, in determining whether there is "substantial
> similarity" between two works, "[t]he key . . . is . . . the similarities rather
> than the differences." *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558
> F.2d 1090, 1093 n. 4 (2d Cir.1977). We agree with Plaintiff that it is "entirely
> immaterial that, in many respects, plaintiff's and defendants' . . . works are
> dissimilar, if in other respects, similarity **as to a substantial element of
> plaintiff's work** can be shown." 4 Nimmer § 13.03(B), at 13–52 to 53.

*Attia v. Society of the New York Hosp.*, 201 F.3d 50, 58 (2d Cir. 1999), *cert. denied*, 531 U.S.

843 (2000) (emphasis added).

On the other hand, differences are hardly *irrelevant*, as "dissimilarity can be important in determining whether there is substantial similarity." *Attia*, 201 F.3d at 58.

Latele argues [ECF No. 191, pp. 13-14] that summary judgment "has been held to be particularly inappropriate **in copyright cases** due to their inherent subjectivity." (emphasis by plaintiff in original memorandum). Plaintiff contends that copyright cases "rarely avail themselves of determination prior to trial" because proof is "fact-intensive and highly circumstantial." [*Id.* at p. 14]. To support these statements about the supposed inappropriateness of summary judgment, Latele cites to two cases: *Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972, 977 (2d Cir. 1980), *cert. denied,* 449 U.S. 841 (1980) and *Arnstein v. Porter,* 154 F.2d 464 (2d Cir. 1946). The Court does not find these cases persuasive because they appear to be somewhat outdated and more-current courts do not adopt that traditional hesitation (or they find an exception).

For example, it is certainly true that the *Hoehling* court cited the 1946 *Arnstein v. Porter* case for the rule that "summary judgment has traditionally been frowned upon in copyright litigation." 618 F.2d at 977. However, Latele failed to mention that *Hoehling* also discussed a series of copyright cases in the Southern District of New York which all **granted** summary judgment to defendants in copyright cases when all of the alleged similar elements "related to non-copyrightable elements of the plaintiff's work." *Id.* In addition, *Hoehling* also explained that the S.D.N.Y. cases it cited "signal an important development in the law of copyright, permitting courts to put a 'swift end to meritless

litigation' and to avoid lengthy and costly trials." *Id.* (internal citation omitted). Finally, although Latele accurately quoted some of the language from *Hoehling*, the appellate court there **affirmed a summary judgment in favor of defendants in a copyright infringement action** brought by the person holding the copyright to a book about the destruction of the Hindenburg, the huge blimp constructed in Germany during Hitler's reign.

Perhaps more significantly, the Eleventh Circuit, in a 1994 case (14 years after *Hoehling*), cited the language that Latele excerpted from *Hoehling* in its memorandum -- but then unequivocally noted that "in any event, courts have been willing to grant summary judgment in infringement cases where it is clear that the moving party is entitled to judgment as a matter of law." *Beal*, 20 F.3d at 459. Moreover, in an even-later case, the Eleventh Circuit, while recognizing the so-called rule in *Arnstein v. Porter* about courts' historical reluctance to grant summary judgment, affirmed summary judgment in defendant's favor in a copyright infringement action brought by the author of a screenplay against the writer-director, producer, and distributor of a movie -- based on a lack of substantial similarity, the primary ground relied upon by Telemundo here. *Herzog*, 193 F.3d at 1247. Latele is undoubtedly aware of *Herzog*, as it cited the case in its response. [ECF No. 191, p. 14].

Framed by these standards, the Court will assess Telemundo's summary judgment motion and its fundamental theme that Latele cannot demonstrate substantial similarity between the two works.

## IV.   <u>Analysis</u>

Before focusing on the different elements of the scripts of the two works, the Court notes that Latele emphasizes that Olivieri is the author who is responsible for both works. Although Telemundo seeks to undermine the significance of this fact by noting that Olivieri is merely the **co**-author of *Maria Maria* and may have worked on that first project for only a few months, Olivieri undoubtedly had involvement as an author in *both* works. Judge Rosenbaum noted Olivieri's involvement as a writer in both telenovelas in the Order denying Defendant's motion to dismiss. The Court does not view this factor as a case-dispositive issue, but the common involvement of the same writer in both works is, at the least, a factor to add in to the factual mix being assessed.

As noted in the leading copyright law treatise, determining what extent of similarity will constitute a substantial, and therefore infringing, similarity "presents one of the most difficult questions in copyright law" and is "one that is the least susceptible of helpful generalizations." 4 Nimmer on Copyright, § 13.03[A]; *see also Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 63 (2d Cir. 2010). As Nimmer explains, the substantial similarity inquiry is a problem of "line drawing," and the line of substantial similarity "wherever it is drawn will seem arbitrary," 4 Nimmer §

13.03[A] (quoting *Nichols v. Universal Pictures Co.*, 45 F.2d 119, 122 (2d Cir. 1930) (J. Hand)). And as Judge Learned Hand famously noted, the difficulty is compounded by the reality that "the test for infringement of a copyright is of necessity vague." *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 488 (2d Cir. 1960).

The Eleventh Circuit has readily recognized the difficulty inherent in determining whether elements of a work are ideas (which are not subject to copyright protection) or expression, noting that the line is "'not easily drawn'" and is to be determined on "the totality of the facts." *Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters.*, 533 F.3d 1287, 1305 (11th Cir. 2008) (quoting *Palmer v. Braun*, 287 F.3d 1325, 1334 (11th Cir. 2002)  (holding that district court erred by finding that work was not similar to protected work but affirming order denying a preliminary injunction)).

Although there are 376 episodes at issue, the Court may render its decision based on representative samples of the work, rather than being required to look at all episodes in reaching its determination of substantial similarity. 3 Nimmer on Copyright § 12.10[B][3]; *see also Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1131-32 (C.D. Cal. 2007) (court need not review every episode and noting that its review of 8 episodes -- out of 150 -- was sufficient to enable it to determine whether a show was substantially similar).

In addition, in connection with the types of materials which a court can evaluate when analyzing the substantial similarity issue, both sides have submitted expert

witness opinion testimony on the subject, and courts often permit this in copyright infringement cases. *Simone Dev. Corp.,* 602 F.3d at 65 (dismissing complaint but noting that "there can be certain instances of alleged copyright infringement where the question of substantial similarity cannot be addressed without the aid of discovery or expert testimony") (internal quotation omitted); *see also Arista Records, LLC v. Lime Group, LLC,* 784 F. Supp. 2d 398, 414, n. 12 (S.D.N.Y. 2011) (permitting expert testimony in copyright infringement case).

In fact, the presence of competing expert opinions sometimes causes courts to deny summary judgment motions. For example, in *Lessem v. Taylor,* 766 F. Supp. 2d 504, 512 (S.D.N.Y. 2011), copyright holders brought an infringement action alleging that the song "How We Do" infringed their copyrighted song "Elevator." Both sides submitted expert reports containing musicological analyses of the two songs. The Plaintiffs' expert limited his report to the most similar portions of the two songs. Defendants challenged his methodology (because his reports did not explain why the other aspects of the songs did not affect his conclusion), but the Court rejected the request to exclude the opinion. Based on their expert's opinion, Defendants argued that each similarity between the two songs is so commonplace that it could not prove probative similarity. Noting the conflicts between the experts, the court noted that "these and other disagreements between the sides' experts . . . illustrate the inappropriateness of summary judgment of these issues." *Id.*

Given that summary judgment is unavailable if a reasonable jury could differ as to whether the works are substantially similar, the Undersigned notes that a website the Defendants relied upon in an earlier brief, www.seriesnow.com, states that *ERA* is described as a "[r]emake of the [V]enezuelan telenovela *"Maria Maria.*" http://www.seriesnow.com/american-telenovelas/rostrodeanaliael.html (last visited on January 30, 2015). Although this reference is surely insufficient in and of itself to support a ruling denying the summary judgment motion, it is also a point which the Court can consider when assessing whether a reasonable jury could find substantial similarity. Indeed, then-District Judge Robin Rosenbaum noted this website comment when denying Telemundo's motion to dismiss. *Latele Televison C.A.* 2013 WL 1296314, at *4.

In addition, Latele has retained an expert witness who has concluded (in his written report) that the similarities between the two works are "substantial" and "in some instances strikingly similar." [ECF No. 261-1, p. 26]. In addition, this expert, Dr. Tomas Lopez-Pumarejo, issued a supplemental report, prepared after he reviewed a video comparing excerpts from the two works. In this report [ECF No. 261-2, p. 2], he summarizes his opinion as follows: there is "no doubt that ERA is a remake of MM." Dr. Lopez-Pumarejo explained that the "same core story [was] 'narrated' twice in the same sequence of events and with the same distinct details." [*Id.*].

Implicitly recognizing that *scenes a faire* are not subject to protection, this expert acknowledges that the key events often respond to the genre formula -- but he then notes that "the unique formulation of these formulae in the protagonist storyline or core story, the **sequential order in which they unfold**, their distinct details and script, are too often the same in MM and ERA; and that is why these share a same core story." [*Id.* at pp. 2-3] (emphasis added).

The Undersigned recognizes that Telemundo has retained its own expert, Dr. Carolina Acosta-Alzuru -- who reaches a completely different conclusion about the two works. Defendants' expert's opinion is that the dissimilarities between the two works "far outweigh the limited similarities in the triggering plot." [ECF No. 229-2, p. 2]. In the view of Dr. Acosta-Alzuru, the mistaken identities/identity switches in the two telenovelas, which both use an accident and reconstructive surgery to develop these story lines, are merely "a common dramatic scheme in telenovelas" and that the two works "use it differently." [*Id.* at p. 26].

In her report, Dr. Acosta-Alzuru notes that "mistaken identities, unknown real identities and identity changes are staples of the telenovela genre." [ECF No. 229-2, p. 23]. She has the same view of "amnesia, misunderstandings, betrayals and the existence of antagonists." [*Id.*]. She also notes that using an accident to establish an identity switch of a mistaken identity plot is not unique to *Maria Maria* or *ERA*, and she provides examples of other telenovelas in which these elements have been used. The report

includes a table entitled "Mistaken Identities/Identity Changes in Telenovelas and Other Genres," which lists 30 novels, telenovelas, telenovela remakes or films which use these elements. [*Id.* at p. 26].

The Court understands that Telemundo challenges the opinions of Latele's expert and filed a motion to exclude them, but the Court denied that motion, just like it denied Latele's motion to exclude the opinions of Dr. Acosta-Alzuru. [ECF No. 382]. It would be unwarranted, in assessing a summary judgment motion, for the Court to simply deem one expert's opinions more credible than another's. That is what juries are for, and the Undersigned is not inclined to simply substitute my credibility determinations for those which a jury will make at trial. *Cf. Peter Letterese*, 533 F.3d at 1302 (reversing summary judgment in defendant's favor in copyright infringement action even though "a factfinder ultimately may conclude that the similarities between the protected elements of [the works at issue] are not substantial" because the "similarities are significant enough to create a genuine issue of material fact").

Telemundo challenged Plaintiff's expert on the ground, among others, that he reviewed only 17% of the *Maria Maria* episodes and only 33% of the *ERA* episodes. This Court previously denied Defendants' *Daubert* motion but notes that courts have permitted opinion testimony from experts who have reviewed far smaller percentages of the works in question. *Engenium Solutions, Inc. v. Symphonic Techs., Inc.*, 924 F. Supp. 2d 757, 772-74 (S.D. Tex. 2013) (after excluding two defense experts, the

court allowed plaintiff's expert to testify even though he analyzed only 1% of the source code at issue).

Dr. Lopez-Pumarejo's Report compares the two works on appropriate categories: plot, sequence of events, dialogue, the characters, setting, pace, and mood/tone. According to Dr. Lopez-Pumaejo, the core plots of the two works are "identical," and his Report then provides a detailed, point-by-point comparison. The Undersigned will quote this section of the report because it illustrates the similarities between the two works:

   1- *Maria Maria* [Mlv.f] (1989-1990):

<u>Exposition</u>: A devoted mother, loving daughter and loyal friend with an unfaithful husband was discovered burnt beyond facial recognition after her car fell down a cliff, but only the identification documents of the other woman in the vehicle were recovered. She had lost control and the vehicle fell down a cliff and exploded in fire.

<u>Conflict</u>:  The protagonist survived amnesia and with the wrong face, as plastic surgeons had based her facial reconstruction on the other woman's identification documents. When she re-encountered her real family and best friend they all sensed a strong connection with her and vice versa, but they did not understand why.

Climax: The other woman, who was thought dead, reappeared and then there were two different women with the same face and the same name. The protagonists' family and her best friend learned that she carried somebody else's face, and helped her recover from amnesia.

Resolution: The protagonist reunited with her family and friends and got married again.

2- *El rostra de Analia* [ERA] (2008-2009):

Exposition: A devoted ·mother, loving daughter and loyal friend with an unfaithful husband was discovered burnt beyond facial recognition after a car accident next to the identification documents the woman who was in the vehicle with her. The protagonist had lost control of the car, which fell down a cliff and exploded in fire.

Conflict: The protagonist survived amnesia and with the wrong face, as plastic surgeons had based her facial reconstruction on the other woman's identification documents. When she re-encountered her real family and best friend, they all sensed a strong connection with her and vice versa, but they did not understand why.

Climax: The other woman, who was thought dead, reappeared and then there were two different women with the same face and·the same name. The protagonists' family and her best friend learned that she carried somebody else's face, and helped her recover from amnesia.

_Resolution_: The protagonist _reunited_ with her family and friends and got married again.

[ECF No. 261-1, pp. 8-9].

In the Order denying Telemundo's motion to dismiss, Judge Rosenbaum stressed the **sequence** of events as playing a significant role in removing the similarities from the realm of idea to the expression of ideas. As explained in that Order, "quite simply, nothing about the telenovela genre demands the unfolding of events as they are alleged to have occurred in both works or even that all of the shared incidents happen in a single work." 2013 WL 1296314, at *10. Judge Rosenbaum noted numerous examples of major plot developments which easily could have unfolded in different ways. For example, "the protagonist and the person whose identity she assumes could have been in an explosion elsewhere, under different circumstances." [_Id._]. To provide two more illustrations pinpointed by Judge Rosenbaum, "rather than being held captive, the passenger could have also been amnesiac before reappearing" or "the passenger could have had an identical twin who came and took her place." [_Id._].

These points, which focus on the **sequence**, are as true today as they were when the Court denied the dismissal motion. Noting that the "possibilities (of other plot twists) are endless," the prior Court explained that "all of these events occur in a single work – and they **all happen in precisely the same order**." [_Id._ at 18]. Thus, Judge

Rosenbaum concluded, "these circumstances render the details that are similar copyrightable." [*Id.*].

The Order denying the motion to dismiss was not based on Latele's expert report, because it had not yet been filed. As it turned out, however, that report also underscores the importance of the **sequence** of major plot points, describing the order in which the key narrative triggers unfold as "significantly similar." [ECF No. 261-1, p. 9]. Given that dynamic, the Undersigned will excerpt the relevant portions of that report because they highlight significant points (at least according to Latele's expert) concerning **sequence**:

1- *Maria Maria* [MM] (1989-1990)

a. Santos Irrazabal, Julia Mendoza's husband, was having an affair with shallow and ill-tempered socialite Maria Fernanda Alcantara. Alberto Mendoza, Julia's father, committed suicide because of a scandal that Santos and his brother Sanson fabricated with falsified real estate documents. Julia blamed Esteban Araujo, Maria Fernanda's husband, [because] her father thought that Esteban Araujo schemed the scandal, and had shot himself using Araujo's gun.

b. Maria Fernanda wanted to save her marriage with Esteban Araujo and visited Julia to clarify that there was nothing serious between her and Santos. The two women went for a drive to have this conversation, and that is [when] the accident

happened.  Julia was overwhelmed and upset, and lost control of the car, which fell down a cliff and blew up in [a] fire.

c. Julia was found burnt and disfigured next to Maria Fernanda's identification documents, and the burnt bones of another woman were found in close proximity and thought to be Maria Fernanda's.  Maria Fernanda's family buried these remains in a funeral ceremony.  The impact had actually thrown Maria Fernanda quite a distance from the vehicle.

d. The plastic surgeons reconstructed Julia's face as if she were Maria Fernanda based on the identification documents found next to her.  Julia woke up amnesiac.

e.  Julia began to live Maria Fernanda's life. Maria Fernanda's family and friends thought that the accident had changed her personality, unaware that the woman they were dealing with was actually Julia.  Julia did not sense a connection with them as she did when she eventually encountered her husband Santos, her mother Sagrario, her son Daniel, her house staff, and her best friend Leonor, a nun called Sister Calvario.

f.  Leonor recognized the scar that Julia had on her wrist, the same scar that she had on hers, as they had cut themselves in elementary school to become blood sisters. Leonor began to make others -- Julia included -- realize that Maria Fernanda was actually Julia. Julia had felt a strong bond with her mother Sagrario, William Guillermo Matute, her illegitimate brother and her staff, even when they all

thought that she was Maria Fernanda, who they did not like, so they kept their distance at first.

g. Jeremias, an old beggar who lived in a shantytown, had kept Maria Fernanda captive after finding her and taking her away from the wreck, to eventually use her for extortion. She escaped from Jeremias with the assistance of Jaime, Esteban's father, who accidentally found her.

h. Maria Fernanda reappeared in the story and Julia ended up returning to her loved ones and her son Daniel. Julia married a man she used to hate because she had previously thought that he caused her father's suicide: Esteban Araujo, Maria Fernanda's husband.

2- *El rostra de Analia* [MM] (2008-2009):

a. Daniel Montiel, Mariana's husband, was having an affair with his wife's cousin, capricious and ill-tempered socialite Sara Andrade, who was also a top manager at the family's airline. At Sara's request, her partner-in-crime Mafioso Ricky Montana had asked feisty Ana Lucia Moncada to kill Mariana. Ana Lucia was an undercover police agent pretending to be a star stripper (Analia) to gather evidence and [apprehend] Montana, in revenge for having killed her boyfriend.

b. Mariana found out about Daniel's infidelity during their wedding anniversary celebration and desperately drove away in his car in full speed. She was unexpectedly stopped by an armed Analia, who forced herself into the car, pointed

the gun at Mariana's head and asked her to drive away fast, and told her that she had been asked to kill her, but would not. Overwhelmed and upset, Mariana lost control of the car, which fell down a cliff and blew up in fire.

    c.    Mariana's body was found burnt and disfigured next to Analia's identification documents.  The burnt bones of another woman found later on at the site of the accident were thought to be Mariana's, and they were buried in a funeral ceremony.

    d.    Dr. Rivera, a cloning scientist[,] and his assistant, Roberto, witnessed the accident and rushed Mariana to his secret laboratory at home, along with Analia's identification  documents. They reconstructed Mariana's face and body through cloning, computer assisted design and plastic surgery, as *if* she were Analia. Mariana woke up amnesiac.

    e.    Dr. Rivera adopted Mariana as family and, thinking that she was a mafia-related stripper in trouble, did not reveal her identity to her to protect her. He told her that he knew nothing about her except for her name: Ana. When at a nearby beach resort, Ana rescued a drowning girl who happened to be her daughter Adriana. Adriana and her father, that is, Mariana's husband, were so taken by Ana that he offered her work as a nanny. That is how Mariana went back home and reunited with her family, her house staff, her best friend Isabel, who was the corporate lawyer of her family's airline, and the personnel that she had worked with as president. She

sensed a strong, loving connection with those that she reencountered and vice versa (except with her [evil] mother Carmen and cousin Sara), but nobody knew why.

f.   Isabel commented to Dr. Rivera that, with Ana, she felt as if she were with her best friend Mariana, explaining that her bond with Mariana was so strong since their school days that they cut their hands to become blood sisters. Adriana grew attached to Ana as if they had known each other for years. So did Ernesto Andrade, her father and Miguel Palacios, her (illegitimate) brother. Daniel and Ana fell in love thinking that it was the first time. He confessed to her that he was sorry for being irresponsible in the past, and unfaithful to Mariana. Meanwhile, Sara schemed with Mariana's mother and drug dealer Ricky Montana how to separate Ana (Mariana) from her husband and family, for which Ana was stalked and kidnapped more than once but escaped with the help of agent Analia's police squad. Analia's mother and sister wanted her back home in the ghetto when she reappeared after being thought dead. They sensed that she was not their loved one, but still liked her.

g.   Dr. Rivera's obsessive-protective behavior became excessive. He had fallen in love with Ana, who loved him as a father. But he managed to be kind and respectful to her because his obsession shifted away from Ana to Analia. It was revealed that he had found her close to the car wreck after he found Mariana. Like MM's Maria Fernanda, the impact had actually thrown her quite a distance from the vehicle. Dr. Rivera also used cloning to resuscitate Analia and to reconstruct her face and body. He

had held her captive (like Jeremias did to MM's Maria Fernanda before she reappeared) at his laboratory and continued to conduct experiments on her.

Once freed, Analia resumed her mission to set up Montana's arrest, although Mariana had already taken up her role as an agent. Eventually Mariana recovered her memories and her true identity with the help of her loved ones. She went back to Daniel, her daughter Adriana, her best friend Isabel . . . and even her real mother (Olga Palacios, her brother Miguel's mother... so Miguel and Mariana actually had the same mother and father), as it turned out that Carmen had stolen her as a baby. Mariana then remarried the man she had previously hated because of his unfaithfulness: Daniel Montiel, her husband.

[In] conclusion, the eight narrative modules that organize the sequence of events in MM and ERA are essentially the same, in the order that follows:

   a.  Infidelity;

   b.  accident;

   c.  mistaken identity;

   d.  plastic surgery;

   e.  the amnesic protagonist re-encountered, with a different face and name, those that she knew;

   f.  the protagonist's best friend, and later on her bastard brother, realized who she really was, as she slowly recovered her memory;

g. the woman whose face the protagonist carried, who supposedly died, reappears after being held captive, triggering the story's resolution;

h.  the protagonist reunited with her child and loved ones, and  married the man with who she was in bad terms before the accident, plastic surgery, amnesia and identity change.

[ECF No. 261-1, pp. 9-15].

On the other hand, Telemundo notes that there are myriad **differences** between the two works. The Defendants also point out that the similarities are comparatively few in number, and they highlight the myriad sub-plots and character types present in *ERA* (but not also present in *Maria Maria*). While these points are undoubtedly correct and might be sufficient to help sway a jury into concluding that there is no substantial similarity of protectable elements between the two works, these two points are not adequate to convince the Undersigned that **no** reasonable jury could conclude that there is substantial similarity.

For example, in *Palmer v. Braun*, the appellate court disagreed with the district court's finding and concluded that there were substantial similarities between a copyrighted self-improvement course and a competitor offering similar materials. The Eleventh Circuit noted that the defendant copied fifteen sentences from fifty-three pages of copyrighted materials -- but then explained that these sentences, while only a *"fraction"* of the total work, must "be viewed in context." 287 F.3d. at 1334. Using that

approach, the appellate court concluded that the use was not de minimis because the defendant did not "inadvertently sprinkle his work with [the copyright holder's] sentences, instead, he uses the same sentences in the same exercise as [the originator] and intends to achieve the same result with them." *Id.*

Furthermore, as explained by Nimmer (who quotes a leading case, albeit one from 1936), "no plagiarist can excuse the wrong by showing how much of his work he did *not* pirate."[5] 4 Nimmer on Copyright, §13.03[B][1][a] (emphasis supplied); *see also Shaw*, 919 F.2d at 1362 (quoting language from the 1936 *Sheldon* case and noting -- in reversing a summary judgment for the defendant writer -- that the different themes in the plot of the allegedly offending work "although different, are secondary and do little to erode the similarity between the central themes embodied in the titles of the two works").

Telemundo's summary judgment motion focuses, in part, on the large number of dissimilarities between the works. But "even if a copied portion be relatively small in proportion to the entire work, if qualitatively important, the finder of fact may properly find substantial similarity." *Shaw*, 919 F.2d at 1363 (quoting *Baxter v. MCA, Inc.*, 812 F.2d 421, 425 (9th Cir. 1987) (reversing summary judgment for defendant in infringement lawsuit brought by composer of copyrighted song)); *see also Spry Fox LLC v. LOLApps, Inc.*, No. 2:12-cv-00147, 2012 WL 5290158 (W.D. Wash. Sept. 18, 2012) (citing *Shaw* when

---

[5]     *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 56 (2d Cir. 1936) (J. L. Hand), *cert denied*, 298 U.S. 669 (1936).

analyzing differences between the two works and noting that "a court must focus on what is similar, not what is different, when comparing two works.").

Consistent with this approach, the *Peter Letterese* court, in reversing a defense summary judgment, was not swayed by the defense argument that the borrowed expression did not exceed one percent of defendants' course materials. Noting that the argument was "not really on point," the Eleventh Circuit explained that "it is the relative portion of the copyrighted work – not the relative portion of the infringing work – that is the relevant comparison." 533 F.3d at 1307. Consequently, the appellate court held that the qualitative importance of the copied material was significant enough to preclude summary judgment, even though "the amount of expression may be quantitatively small." *Id.*

As noted, Telemundo's other primary focus is to challenge the similarities between the two telenovelas as *scenes a faire*. To be sure, using *scenes a faire* from one work will usually not subject a second work to a successful copyright infringement claim, in the absence of further similarity. Nevertheless, "even if none of these plot elements is remarkably unusual in and of itself," plots which share a "common sequence and rhythm" may "give rise to a triable question of substantial similarity of protected expression." *Shaw,* 919 F.2d at 1362-63 (acknowledging that author "relies heavily" on *scenes a faire,* recognizing that author plaintiff's list of 26 "strikingly similar

events" is actually a "compilation of random similarities scattered throughout the works" but nonetheless finding that a jury trial issue precluded summary judgment).[6]

*Scenes a faire* are, as outlined above, elements which flow naturally from the work's theme. For instance, a story about police life in the South Bronx is likely to depict "drunks, prostitutes, vermin and derelict cars," juxtaposed about hard-drinking cops chasing fleeing criminals. *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 40 (1986); *see also Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1176 (9th Cir. 2003) (mere fact that works about magicians feature a masked magician revealing magic tricks cannot constitute copyright infringement).

But Telemundo has not sufficiently established that the common themes typically found in telenovelas always occur in the same sequence of significant events. Moreover, they do not give sufficient recognition to the notion that *scenes a faire* "at some point cross the line [from a not copyrightable "stock scene"] into "expression" and are "protected by copyright" when "plots become more intricately detailed and characters become more idiosyncratic." *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1266 (11th Cir. 2001); *see also Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1299 (D.C. Cir. 2002) (reversing summary judgment in defendant's favor on copyright infringement claim because the defendant's design, though different in some ways, is

---

[6]    After the appellate court remanded the case, a jury returned a verdict for plaintiff on the remaining claim of copyright infringement, but the trial court granted defendants' motion for judgment as a matter of law and conditionally granted a new trial motion. *Shaw*, 809 F. Supp. At 1393

"sufficiently similar with respect to both individual elements and overall look and feel for a reasonable jury to conclude the two are substantially similar").

This latter point is particularly relevant. Even if some, or many, of the similarities cited by Latele involve *scenes a faire*, the details in those scenes and the sequence in which they are presented carry at least certain aspects from the realm of not copyrightable s*cenes a faire* to protectable expression. So, for instance, both works involve a car crash, amnesia and subsequent identity change. Defendants argue these are *scenes a faire*, common in telenovelas, and therefore must be excluded from the analysis. However, certain elements of those scenes (and others, presented in *ERA* in the same sequence as presented in *Maria Maria*) are more unique and so similar that they undermine the notion that **no** reasonable jury could find the two works are substantially similar.

For example, in both works, one person in the vehicle is thrown such a great distance by the crash that she is never found following the accident. In addition, there just happens to be the bones of a third person at the scene of the crash in each work, who others mistake for one of the vehicle's occupants. Defendants have not adequately shown that such details are somehow automatically unprotectable *scenes a faire*.

Thus, this case is significantly similar to *Metcalf*. 294 F.3d at 1075. Even accepting Defendants' argument that most of Plaintiff's cited similarities are unprotectable *scenes a faire*, the sequence and arc of those scenes in both telenovelas have much in common,

and a jury *could* find that the two works are substantially similar on those grounds. To be sure, some courts have rejected a *Metcalf* theory in specific cases where the similarities are *randomly* scattered across a work. *See, e.g., Buggs v. Dreamworks, Inc.*, CV 09-07070 SJO AGRX, 2010 WL 5790251, at *7 (C.D. Cal. Dec. 28, 2010) (citing cases rejecting *Metcalf* claims over random similarities). But the similarities between *Maria Maria* and *ERA* are not randomly scattered -- they involve an entire story arc of similar scenes, including *scenes a faire*, placed in the same significant sequence.

In addition, the Undersigned notes that the *Metcalf* court found it important in conducting its analysis that the defendant had access to the allegedly infringed-upon work. *Metcalf*, 294 F.3d at 1075. Certainly, that element is met here as well -- Kiko Olivieri played at least some role in authoring both works.

Telemundo argues that Latele's reliance on the sequence of events is insufficient, and cites to *Identity Arts v. Best Buy Enter. Svcs., Inc.*, Nos. C 05-4656, C 06-1631 2007 WL 1149155 (N.D. Cal. 2007 April 18, 2007). To be sure, the court there did find that the sequence of events were not sufficiently unique or concrete to warrant copyright protection. But the court did not find that sequence is always irrelevant or could never be a significant factor in generating a copyright claim. Instead, it merely found that most of the specific sequences at issue in the claim were unprotected *scenes a faire* or, on a fact-specific analysis, not substantially similar. Moreover, the Eleventh Circuit analyzes sequence of events as a factor when comparing two works to see if they are

substantially similar. *Beal,*, 20 F.3d at 463; *Herzog,* 193 F.3d at 1249 (quoting Z. Chaffee, *Reflections on the Law of Copyright,* 45 Col. L. Rev. 503, 513 (1945) ("protection covers the 'pattern' of the work . . . the **sequence of events** and the development of the interplay of characters") (emphasis added)).

As noted above, a defense summary judgment is available in copyright infringement cases when "the similarity between two works concerns **only** non-copyrightable elements of the plaintiff's work, or because **no** reasonable jury, properly instructed, could find that the two works are substantially similar." *Herzog,* 193 F.3d at 1247 (emphasis supplied). Telemundo does not actually contend that all of the elements are fundamentally different. Instead, it says that "**virtually** all of the applicable elements of the two works . . . are fundamentally different." [ECF No. 175, p. 1 (emphasis added)]. It also argues that "a vast **majority**" of the "scattered similarities" are not protectable because they are *scenes a faire.* [*Id.* at 2 (emphasis added)]. Finally, Telemundo contends that the "handful of alleged similarities" remaining after the unprotectable elements are filtered out are de minimis and do not meet the "substantial similarity" threshold. [*Id.*]. In its Reply, Telemundo asserts the same types of descriptions. For example, it contends that "many" of the alleged similarities do not help satisfy the "substantial similarity" test. [ECF No. 210, p. 10].

Concerning the second requirement, the Undersigned is not convinced that **no** reasonable jury could find the two telenovelas substantially similar. A reasonable jury

would, of course, be permitted to take the differences (such as sub-plots) into consideration and evaluate whether the differences outweighed the similarities, and, if so, in what way. And a reasonable jury would be instructed to deem *scenes a faire* as unprotectable elements -- and could also place little or no reliance on Dr. Lopez's expert opinion because of, among other reasons, concessions that transformation through identity substitution is common in the telenovela genre and that the sub-plots in *ERA* render that work significantly different than *Maria Maria*.[7]

Given the uncertainty inherent in determining whether there is substantial similarity between two works, the Undersigned is not now prepared to grant summary judgment to Defendants. It may well be that Telemundo will prevail at trial. Likewise, it may well be that 1 out of 10 (to provide one of many hypothetical scenarios) reasonable juries would reach a verdict in Defendants' favor. The reality of what actual juries might conclude is, of course, speculative, and the odds might turn out to be more favorable to Plaintiff, or they might turn out to be less favorable. The point here is that many of the similarities are indeed *scenes a faire*, a scenario which produces substantial -- but not necessarily insurmountable -- hurdles for Latele on the substantial similarity issue.

---

[7]     Of course, the jury would also be instructed on the *Metcalf* approach, so the jury *might* conclude that some or all of the *scenes a faire* are in fact protectable, depending on how it assesses the sequence of similar events and the degree of similarity in *ERA's* presentation of the sequence.

Those are difficult and challenging odds, to be sure, but the legal litmus test is if "any" reasonable jury could find substantial similarity, and the Court cannot with sufficient certainty for summary judgment purposes conclusively determine that no reasonable jury could find the requisite substantial similarity from the elements subject to protection. *Metcalf*, 294 F.3d at 1075; *Peter Letterese*, 533 F.3d at 1302; *Shaw*, 919 F.2d at 1363 ; *see also Cellular Accessories for Less, Inc. v. Trinitas LLC*, No. CV 12-06736, 2014 WL 5700112 (C.D. Cal. November 5, 2014) (denying defendants summary judgment motion on copyright claims because of the existence of a factual issue concerning substantial similarity of protectable elements between product descriptions on websites); *Batiste v. Najm,* 28 F. Supp. 3d 595, 624-625 (E.D. La. 2014) (concluding that the lyrics to allegedly infringed songs were not entitled to copyright protection, concluding that the chords and beat in dozens of songs are unprotectable *scenes a faire*, further concluding that the chant and melody/hook were not sufficiently similar -- but then **denying** summary judgment as to three pairs of songs because a reasonable juror could find substantial similarity even though the similarities between one pair were "not as striking" as those between another pair of songs); *Monterey Bay Homes, LLC v. Chambers,* 11 F. Supp. 3d 570 (D.S.C. 2014) (triable issue remained as to whether architectural plans for home created by design company were substantially similar to plaintiff's copyrighted plans, court denied defendant's summary judgment motion even though the copyright protection of the architectural work was "thin").

V.     **Conclusion**

The Undersigned **denies** Defendants' [ECF No. 175] summary judgment motion.

**DONE AND ORDERED** in Chambers, in Miami, Florida, February 2, 2015.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to**:
All Counsel of Record

46